# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-1738

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Northern District of Iowa. |
| Gregory Roggeman, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: October 2, 2001

Filed: February 1, 2002

_____

Before BOWMAN, HEANEY, and BYE, Circuit Judges.

_____

BOWMAN, Circuit Judge.

The United States appeals the District Court's grant of defendant Gregory Roggeman's motion to suppress all evidence seized from his person, pickup truck, and residence. A pat-down search of a bulge in Roggeman's right-front pants pocket during a routine traffic stop led to a state trooper's initial seizure of marijuana and drug paraphernalia. The government argues that the trooper's pat-down was justified by reasonable suspicion that Roggeman was presently armed and dangerous and that the District Court thus erred in concluding that the pat-down violated the Fourth Amendment. We agree and therefore reverse and remand for further proceedings.

Just before midnight on September 7, 2000, Gregory Roggeman was driving his pickup truck near his home in Mason City, Iowa. Iowa State Trooper Ryan Moore pulled up behind Roggeman's truck at a stop sign. When Roggeman accelerated away from the stop sign, Trooper Moore noticed the truck making unusually loud exhaust noises. He pulled Roggeman over to investigate a possible muffler violation.[1] Roggeman was the only person in the truck; Trooper Moore was alone as well. The trooper walked up to the truck's driver's-side door and asked Roggeman through his open window for his driver's license. The trooper informed Roggeman that he had been stopped for having a faulty muffler. Roggeman admitted that the truck's muffler had a hole in it and told the trooper that he was heading home from a shop where he had been working on the truck.

Trooper Moore told Roggeman that he intended to issue him a warning for his muffler violation. He then requested that Roggeman "come back and have a seat in the patrol car." Tr. of Videotape. Trooper Moore testified at the suppression hearing that he makes it part of his "normal routine" to ask motorists to whom he intends to issue a citation or warning to come back to his patrol car. Tr. at 12. Almost immediately after the trooper asked Roggeman to exit his truck, the trooper started asking Roggeman whether he had any weapons. Roggeman said he did not.

The parties dispute, and the record does not make clear, the precise sequence of events from the time Trooper Moore asked Roggeman to come back to his patrol

---

[1]The record includes an audio videotape that a recording device in the trooper's patrol car made of the encounter. The recording begins just before the trooper pulls over Roggeman's truck and continues throughout the duration of the disputed pat-down search. The tape was admitted into evidence at the suppression hearing, and the transcript (with unnumbered pages) that the District Court made of the audio portion of the tape is included in the record on appeal.

car to the time the trooper first patted Roggeman down. Significant disagreement also exists as to the number of pat-downs to which Trooper Moore subjected Roggeman.[2] Trooper Moore's testimony, however, was unequivocal and uncontradicted that his observation of the bulge in Roggeman's right-front pants pocket took place before he performed the pat-down. Moreover, the District Court adopted the magistrate judge's finding that the trooper "did, in fact, see the bulge before he patted Roggeman's pocket." United States v. Roggeman, No. CR00-3046-MWB, at 12 (N.D. Iowa Jan. 30, 2001) (Report and Recommendation).

Most of the light on the scene came from the patrol car's headlights and spotlight, but the trooper also had a flashlight in his hand. Trooper Moore ran the beam of the flashlight over the door of the truck as Roggeman began opening it. Although the District Court and the magistrate judge do not mention it, it is readily apparent from the videotape that the trooper then ran his flashlight's beam over the front of Roggeman's torso and legs as he stepped from the truck. As Roggeman set foot on the ground and turned to walk toward the patrol car, the trooper shone the flashlight directly on both of Roggeman's front pants pockets.

The exact chronology again is unclear, but within several seconds after Roggeman opened his truck's door, Trooper Moore saw the bulge in Roggeman's

---

[2]The District Court and magistrate judge did not make an express finding on this question. The magistrate judge's report seems to find implicitly that Trooper Moore conducted at least two pat-downs of Roggeman's right-front pants pocket before Roggeman got into the trooper's patrol car, see United States v. Roggeman, No. CR00-3046-MWB, at 4-5 (N.D. Iowa Jan. 30, 2001) (Report and Recommendation); however, both Trooper Moore's testimony and the videotape of the incident are ambiguous regarding whether, after Roggeman exited his truck but before he got into the patrol car, Trooper Moore patted him down only once or more than once. The parties' attorneys did not fully develop the trooper's testimony on this issue. (The government's brief inexplicably suggests that the number is three. See Br. of Appellant at 3.)

right-front pants pocket. Trooper Moore testified that during his initial pat-down of the pocket he immediately recognized that the cause of the bulge was a plastic or "cellophane" bag (which, when removed from Roggeman's pocket, was found to contain the marijuana) and a marijuana pipe. Specifically, approximately 4.7 grams of marijuana, a marijuana pipe, and a lighter were fetched from Roggeman's pocket.[3]

After the trooper seized the contents of Roggeman's pocket, Roggeman and the trooper sat in the patrol car while the trooper wrote citations for the marijuana and marijuana pipe. By then, the trooper apparently had decided not to arrest Roggeman but only to conduct a complete pat-down search of Roggeman's person and then to search his truck before sending him on his way. While conducting these additional searches, Trooper Moore found more marijuana, a white powdery substance that he concluded was methamphetamine, and a bottle of inositol powder, an agent commonly used for diluting or "cutting" methamphetamine. He then arrested Roggeman. When officers carried out a search warrant at Roggeman's residence the next day, they found more marijuana, more drug paraphernalia, and an SKS assault rifle.

On October 26, 2000, a federal grand jury returned an indictment against Roggeman charging him with two counts: possessing methamphetamine with the intent to distribute, see 21 U.S.C. § 841(a)(1), (b)(1)(C) (1994 & Supp. V 1999), and being a convicted felon and unlawful user of a controlled substance in possession of a firearm, see 18 U.S.C. § 922(g)(1), (g)(3) (1994). After conducting an evidentiary hearing on Roggeman's motion to suppress, a magistrate judge filed a report recommending that the District Court grant the motion. Roggeman did not contest the legitimacy of the initial traffic stop, but the magistrate judge concluded that the

---

[3]Although the record suggests that Roggeman removed the marijuana and marijuana pipe from his pocket himself and then surrendered it to the trooper, the government apparently waived any argument it may have had that, from a Fourth Amendment standpoint, this surrender was voluntary. See Tr. at 75-77.

state trooper's pat-down search of Roggeman for weapons after the initial stop violated his Fourth Amendment rights. The government filed several objections to the factual findings and legal conclusions supporting the magistrate judge's report and recommendation.

After conducting a de novo review of the record, the District Court adopted the report and recommendation with little modification. The court concluded that the pat-down search violated the Fourth Amendment because, when the trooper patted Roggeman down, he did not have a reasonable, articulable suspicion that Roggeman might be armed and dangerous. The court ordered that the marijuana and marijuana pipe the trooper seized during the pat-down search be suppressed. It also ordered the suppression of all evidence seized as a result of searches subsequent to the pat-down as the "fruit of the poisonous tree." We reverse because we conclude that the pat-down was justified by reasonable suspicion.

## II.

This appeal turns upon whether Trooper Moore's pat-down of Roggeman's right-front pants pocket was justified by reasonable suspicion.[4] The determination of whether a protective pat-down search for weapons was supported by reasonable suspicion is a mixed question of law and fact, which we review de novo. See Ornelas

---

[4]In addition to his argument that the pat-down was not justified by reasonable suspicion, Roggeman argued in his motion to suppress that the pat-down was unconstitutional because the trooper's subsequent seizure of the contraband in Roggeman's right-front pants pocket did not conform to the standards of the "plain feel" doctrine. See Minnesota v. Dickerson, 508 U.S. 366 (1993). After determining that the initial pat-down itself violated the Fourth Amendment, the magistrate judge's report concluded that this determination obviated any need to reach the "plain feel" issue. The District Court did not modify this conclusion, and neither party briefed Roggeman's "plain feel" argument on appeal. Since the issue is not before us, we do not address it.

v. United States, 517 U.S. 690, 696, 699 (1996). We review the material findings of historical fact for clear error and "give due weight to inferences drawn from those facts" by the district court. Id. at 699.

The Fourth Amendment forbids searches and seizures that are unreasonable, Terry v. Ohio, 392 U.S. 1, 9 (1967), and "generally requires police to secure a warrant before conducting a search." Maryland v. Dyson, 527 U.S. 465, 466 (1999). A law-enforcement officer is nevertheless justified in making a limited, warrantless search for the protection of himself or others nearby in order to discover weapons if he has a reasonable, articulable suspicion that the person may be armed and presently dangerous. Terry, 392 U.S. at 30. Because the "sole justification" for such a search is the protection of the officer and others, its scope must be confined to a search reasonably designed to discover concealed weapons. Id. at 29; see also Adams v. Williams, 407 U.S. 143, 146 (1972) ("So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose."). Courts are required to apply an objective test to resolve the question whether reasonable, articulable suspicion justified a protective search. Terry, 392 U.S. at 22 (explaining that a test based on an officer's subjective, good-faith belief that the person is armed is an insufficient constitutional safeguard, for it would subjugate Fourth Amendment protections to the good faith of law-enforcement officers). Under this objective standard, the "officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Id. at 27.

The level of suspicion necessary to constitute reasonable suspicion that will, in turn, justify a protective pat-down search "is considerably less than proof of wrongdoing by a preponderance of the evidence" and "is obviously less demanding than that for probable cause." United States v. Sokolow, 490 U.S. 1, 7 (1989). Nevertheless, the Fourth Amendment requires "some minimal level of objective

justification." Id.; accord Terry, 392 U.S. at 27 ("[I]n determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.").

Reasonable suspicion is not a "finely-tuned" or bright-line standard; each case involving a determination of reasonable suspicion must be decided on its own facts. Ornelas, 517 U.S. at 696; Terry, 392 U.S. at 29 ("[T]he limitations which the Fourth Amendment places upon a protective seizure and search for weapons . . . will have to be developed in the concrete factual circumstances of individual cases."); cf. United States v. Cortez, 449 U.S. 411, 417 (1981) ("Terms like 'articulable reasons' and 'founded suspicion' are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise."). In order to determine whether the facts and circumstances surrounding a Terry search and seizure give rise to reasonable suspicion, "the totality of the circumstances—the whole picture—must be taken into account." Cortez, 449 U.S. at 417.

Here, the evidence supports a conclusion that Trooper Moore's initial pat-down search was justified by reasonable, articulable suspicion. Trooper Moore was alone, he stopped Roggeman late at night, and the scene of the stop was poorly lit. These facts go to officer safety, the seminal justification for the Supreme Court's development of the Terry stop. The Court explained in Terry that the great risks that investigatory detentions present to officer safety tip the scales balancing the government's interest in protecting law-enforcement officers against the individual's right to personal security in favor of finding limited, protective searches to be constitutional. See 392 U.S. at 22-27. In its previous decisions, this Court has concluded that the fact that a suspect was detained late at night by a lone officer in a poorly lit area adds to the reasonableness of an officer's conclusion that the person he has detained should be frisked for weapons. See United States v. Douglas, 964 F.2d 738, 740-41 (8th Cir. 1992); United States v. Buchannon, 878 F.2d 1065, 1067

(8th Cir. 1989) (concluding that, in addition to the fact that appellant was a large man wearing a long winter coat which might have concealed a weapon, the fact that the officer was alone lent support to a finding of objective reasonable suspicion); cf. United States v. Crittendon, 883 F.2d 326, 329 (4th Cir. 1989) (explaining that the facts that the "'hour was late, the street was dark, the officer was alone, and the suspected crime was a burglary, a felony that often involves the use of weapons'" supported its conclusion that the officer's stop and frisk of the defendant was supported by reasonable suspicion (quoting United States v. Moore, 817 F.2d 1105, 1108 (4th Cir.), cert. denied, 484 U.S. 965 (1987))). While the District Court minimized the significance of these facts, they nevertheless are present and lend some support to the conclusion that the pat-down of Roggeman was objectively reasonable. We also note that, rather than applying the totality-of-the-circumstances test required by Terry, the District Court considered these facts in isolation without incorporating its finding that Trooper Moore had seen the bulge in Roggeman's pocket before performing the pat-down. See United States v. Roggeman, No. CR00-3046, at 14-16 (N.D. Iowa Feb. 28, 2001) (Memorandum Opinion and Order).

Even if, therefore, we were to agree with the District Court's minimization of the legal significance of the fact that Trooper Moore was alone, the hour was late, and the lighting so poor the trooper felt a need to use a flashlight to obtain a good view of Roggeman, our determination that Trooper Moore's protective pat-down was justified by reasonable suspicion receives strong support from the District Court's own finding that the trooper observed the bulge in Roggeman's right-front pocket before he patted down that pocket. When determining whether the totality of the circumstances gave rise to reasonable suspicion justifying a protective Terry search, both this Court and our sister circuits consider a law-enforcement officer's observation of a bulge to be a substantial factor. See, e.g., United States v. Baker, 78 F.3d 135, 137 (4th Cir. 1996); United States v. Brooks, 2 F.3d 838, 842 (8th Cir. 1993), cert. denied, 510 U.S. 1137 (1994); United States v. $84,000 United States Currency, 717 F.2d 1090, 1098-99 (7th Cir. 1983), cert. denied, 469 U.S. 836 (1984);

cf. United States v. Elsoffer, 671 F.2d 1294, 1299 (11th Cir. 1982) (concluding that unusual shape, size, and position of bulge on suspect's person "alone provided not only reasonable suspicion but also probable cause" for his arrest).

Indeed, the facts and circumstances surrounding the protective pat-down search of the motorist in Pennsylvania v. Mimms, 434 U.S. 106 (1977) (per curiam), bear such striking resemblance to the facts of this case that Mimms would seem to require our reversal of the District Court's order. The Court in Mimms was called upon to decide two main questions: whether directing a motorist stopped for a minor traffic violation to step out of his vehicle was a constitutionally permissible seizure, and, more importantly for our analysis, whether patting down the motorist because of a bulge in his jacket was infirm under the Fourth Amendment. The two police officers in Mimms pulled over an automobile for a routine traffic violation (having an expired license tag). Despite concededly having "no reason to suspect foul play from the particular driver at the time of the stop," id. at 109, one officer asked the driver to step out of the vehicle. The officer then noticed "a large bulge" under the motorist's sports jacket. Id. at 107. The officer frisked the driver out of concern that the bulge might be a weapon and seized a loaded handgun from his waistband.

The Supreme Court first concluded that under Terry the officer's seizure of the motorist by ordering him to exit his vehicle did not violate the Fourth Amendment, then treated the question of the propriety of the pat-down as a rather straightforward application of Terry as well. In deciding this second question, the Court summarily concluded that the pat-down search precipitated by the officer's observation of the bulge under the driver's jacket was a reasonable search under the Fourth Amendment. There was, the Court stated, "little question the officer was justified" under the standard enunciated in Terry. Id. at 112. "The bulge in the jacket permitted the officer to conclude that Mimms was armed and thus posed a serious and present danger to the safety of the officer. In these circumstances, any man of 'reasonable caution' would likely have conducted the 'pat-down.'" Id.

The similarities between the facts in the instant case and the facts in <u>Mimms</u> are readily apparent. Like the officers in <u>Mimms</u>, Trooper Moore stopped Roggeman for a minor traffic violation. Like them, he asked Roggeman to step out of his vehicle before having any reason to believe Roggeman might be armed and dangerous or involved in any sort of criminal activity. Then, after Roggeman began exiting his vehicle, but before the initial pat-down, Trooper Moore, using his flashlight, observed the bulge in Roggeman's right-front pocket. The bulge under the driver's sports jacket in <u>Mimms</u> was described as being "large." 434 U.S. at 107. Trooper Moore testified that the size and the shape of the bulge in Roggeman's pocket were factors that made him concerned that it might be a weapon. Tr. at 30-31, 39.

The District Court found that "Trooper Moore did not consider the bulge in defendant Roggeman's pants pocket to have been possibly made by a weapon" when he conducted the initial pat-down. <u>United States v. Roggeman</u>, No. CR00-3046, at 12. Though we believe that as a matter of law this finding would not preclude a determination that the pat-down was objectively reasonable,[5] in fact the finding is

---

[5]As we have noted, we apply an objective test to determine whether a protective pat-down is supported by reasonable suspicion. <u>Terry v. Ohio</u>, 392 U.S. 1, 21-22 (1967). Such an objective inquiry does not, however, require us to ignore all evidence of Trooper Moore's thought processes at the time he patted down Roggeman. When conducting our objective, reasonable-suspicion analysis, we are required to put ourselves, as best we can, into the shoes of the officer who actually performed the protective search. <u>Id.</u> at 27, 30. Trooper Moore's conclusions during the initial moments of his stop of Roggeman are at least some evidence of what a reasonable officer in Trooper Moore's position would have inferred from the facts and circumstances of the encounter. <u>See</u> <u>Ornelas v. United States</u>, 517 U.S. 690, 699 (1996) (explaining that, even though reasonable-suspicion and probable-cause determinations should be reviewed de novo, law-enforcement officers' inferences, drawn from the facts presented to them, are not irrelevant but should be accorded "due weight"). The Supreme Court's analysis of the reasonable suspicion supporting the officers' search and seizure in <u>United States v. Cortez</u>, 449 U.S. 411 (1981), makes it plain that an officer's conclusions drawn from the facts he encounters are a

clearly erroneous. We are firmly convinced that this finding regarding Trooper Moore's state of mind at the time he patted down Roggeman cannot be upheld on this record read as a whole. See Anderson v. Bessemer City, 470 U.S. 564, 573-74 (1985)

---

legitimate subject of inquiry. See id. at 418-21 (considering logical inferences that border patrol officers drew from facts known to them prior to a Terry stop and concluding that those inferences contributed to the legal justification for the stop); accord Terry, 392 U.S. at 21.

The ultimate test, of course, is not what the searching officer actually believed but what a hypothetical officer in exactly the same circumstances reasonably could have believed. The Supreme Court in Whren v. United States, 517 U.S. 806 (1996), for example, ruled that an officer's "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." Id. at 813. Whren and other Supreme Court cases with related holdings stand for the proposition that under Fourth Amendment analysis it is of no consequence "that the motivation for the search did not coincide with the legal justification" for the search. Scott v. United States, 436 U.S. 128, 138 (1978); cf. Graham v. Connor, 490 U.S. 386, 397 (1989) ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force . . . ."); United States v. Villamonte-Marquez, 462 U.S. 579, 584 n.3 (1983). These cases thus foreclose argument by a criminal defendant that an otherwise-justified search and seizure violates the Fourth Amendment because the legal justification—such as the probable cause arising from a minor traffic violation and justifying a traffic stop—was simply a pretext for law-enforcement officers to investigate their hunches regarding criminal activities unrelated to that legal justification.

But, for the reasons we already have explained, we are satisfied that in determining whether the pat-down of Roggeman's pocket was supported by an objectively reasonable, articulable suspicion, the objective approach the Supreme Court has mandated does not make it irrelevant for us to inquire whether at the time of the pat-down Trooper Moore in fact suspected that Roggeman might be armed and dangerous. We emphasize the obvious: at the very least, it would militate against a conclusion that a search was supported by an objectively reasonable, articulable suspicion if in fact the searching officer, based upon his training, knowledge, and evaluation of the circumstances, did not believe it was possible that a bulge in the defendant's clothing was caused by a weapon, yet proceeded to search the defendant.

-11-

(explaining that a district court's finding of fact is not clearly erroneous if it is "plausible in light of the record viewed in its entirety").

Although the District Court and magistrate judge did not agree with some of Trooper Moore's conclusions from the facts and circumstances of the traffic stop and protective pat-down, neither one found or even suggested that Trooper Moore was not a credible witness. During Trooper Moore's testimony at the suppression hearing, the magistrate judge asked him directly about his state of mind at the time he patted Roggeman down. Trooper Moore's testimony was unequivocal throughout this line of questioning that he believed the bulge could have been caused by a weapon.

> THE COURT: Now, when you saw that bulge in the pocket, what went through your mind?
> THE WITNESS: It could be a possible weapon. I was definitely concerned about what it was.
> THE COURT: What kind of weapon?
> THE WITNESS: Be it a gun, a small caliber handgun in the pocket.
> THE COURT: It was of a size that would have been consistent in your mind with a small caliber handgun?
> THE WITNESS: Yes, sir.
>
> . . .
>
> THE COURT: I will just ask you. Did you also think that it might be drugs when you saw the bulge in the pocket?
> TROOPER MOORE: I -- No, I didn't, Your Honor.
> THE COURT: So you thought weapon before drugs?
> TROOPER MOORE: Yes, sir.

Tr. at 36, 40. The government's attorney did not fully develop Trooper Moore's testimony on this issue during direct examination, but on re-direct the trooper again testified that the bulge caused him to be concerned that Roggeman might be armed. Trooper Moore was concerned because of both the fact of and size of the bulge.

-12-

[Mr. Williams:] So when he told you he didn't have any weapons, knives or anything like that on his person, did that alleviate all of the concern you had about whether he had a weapon in his pocket?
[Trooper Moore:] No, it did not.

. . .

[Q.]   Did you have any concern about whether he had a weapon in his right pocket?
[A.]   Yes, I did.
Q.     And what was that based on?
A.     Based upon the bulge and the size of the bulge in his pocket.

Tr. at 30-31.

While the magistrate judge's comments during the suppression hearing are not evidence, we note here that his stated observations during the government's cross-examination of Roggeman are consistent with our conclusion that an officer with Trooper Moore's background and experience would have had a reasonable suspicion that Roggeman might be armed and dangerous. During one segment of the hearing, Roggeman attempted to demonstrate for the magistrate judge that the contents of his pocket on the night of his arrest would not have produced a visible bulge. Tr. at 45-49, 59-61. Instead of using the actual marijuana pipe, however, Roggeman used a bolt which he repeatedly represented to the magistrate judge was the same size as the pipe seized from his pocket. Tr. at 46, 60. Upon viewing this bolt, the magistrate judge had, he said,

> no doubt that something the size of what you are displaying [the bolt], which is supposedly the size of the marijuana pipe, could be a weapon. It could be a knife. If the officer were able to observe that from the pocket, th[en] he would have justification to Terry search [sic].

-13-

Tr. at 53-54. He therefore cut off a line of questioning in which the government was attempting to establish that the size of the items in Roggeman's pocket was consistent with the size of a weapon. Id.

When the magistrate judge later examined the pipe actually seized from Roggeman, he found that the stem of the pipe was larger than the shaft of the bolt used in the courtroom demonstration and that the diameter of the pipe's bowl was almost twice the diameter of the bolt's head. Roggeman, No. CR00-3046-MWB, at 9-10. Although the magistrate judge's report expressed doubt that the size of the bulge would have been as large as the trooper described (i.e., a bulge sticking out "approximately 2 or 3 inches," Tr. at 22-23), the report also found that "[i]t clearly would have been easier than it appeared in the courtroom demonstration for Trooper Moore to see that Roggeman had something in his pocket." Roggeman, No. CR00-3046-MWB, at 10.

The District Court cited two passages from the transcript of Roggeman's counsel's cross-examination of Trooper Moore to support its finding that the trooper, before patting down Roggeman, did not believe that he might be armed. Our review of the entirety of Trooper Moore's testimony, as well as of the entirety of the record, see Anderson, 470 U.S. at 573, leads us to conclude that in these two passages Trooper Moore was disclaiming that he had possessed actual knowledge that the bulge was a weapon. He was not disclaiming that he had been suspicious that a weapon might be causing the bulge. In the first passage the District Court cited,[6]

_____

[6]Counsel for Roggeman questioned Trooper Moore:

Q.    And tell us, if you would, what reason there was that you believed this object you have now described was a weapon in that right front pocket.
A.    I didn't know what the object was. I wanted to know because it was dark and it is hard to visually observe what things are in the dark.
Q.    Okay. So is it -- Would your testimony be -- Would I be correct if I said your testimony was you had no reason to believe it was a

-14-

Roggeman's counsel asked the trooper for the reasons that he had "believed" that what he saw was a weapon. Tr. at 23. Trooper Moore's immediate reply was that he did not "know" what the object in Roggeman's pocket was. Id. Similarly, in the second passage cited by the District Court,[7] Roggeman's counsel again elicited the

---

weapon, but you were curious as to what it was? Would that be fair?
A.    Yes, sir.

Tr. at 23.

[7]Roggeman's counsel again questioned the trooper:

Q.    Trooper Moore, you said he got out of the car and he had a bulge in his pocket and you described it. What made you think it was a weapon?
A.    Just I guess it was concealed in his pocket. I was curious as to what it was.
Q.    I understand you were curious. But it just as well could have been a billfold? Yes?
A.    It wasn't the shape of a billfold.
Q.    Well, could have been [sic] a hockey puck?
A.    Yes, sir.
Q.    Could have been [sic] a cigarette lighter?
A.    Yes, sir.
Q.    And so my question is: He gets out of the car, you see this bulge. Again, I'll ask you, give me one reason that you thought this was a weapon. Just one.
A.    Based upon my training, the way it looked in his pocket, it possibly could have been a weapon.
Q.    Okay. How did it look like a weapon when you saw a bulge in his pocket? How did it look like a weapon?
A.    Just the shape of the object, it made me curious as to what it was.
Q.    Okay. So it didn't look like a weapon, the shape of it made you curious?
A.    Yes, sir.
Q.    And so you have no reason to conclude that it is a weapon other

-15-

trooper's testimony that the bulge could have been made by objects other than a weapon and that he had been "curious" as to what was causing the bulge. Focusing on these statements, the District Court concluded that "Trooper Moore was acting on nothing but a 'hunch' or subjective belief unsupported by objective facts." Roggeman, No. CR00-3046, at 13-14. We are firmly convinced that this is not a conclusion that a reasonable reading of the Trooper's testimony can support. Though Trooper Moore never stated that he was certain that Roggeman was armed, throughout his testimony he continued to assert that he had suspected that Roggeman might have a weapon in his pocket and to explain the rational basis supporting this suspicion. See, e.g., Tr. at 39 ("Q. . . . 'How did it look like a weapon?' A. 'Just the shape of the object, it made me curious as to what it was.'"). For a protective pat-down search to be justified, it is not necessary that the officer have been absolutely certain that the suspect was armed. Terry, 392 U.S. at 27. All the Fourth Amendment requires is objectively reasonable suspicion. The trooper's testimony in the portions of his cross-examination relied upon by the District Court in no way detracts from his consistent testimony that he had been concerned that Roggeman might have a weapon in his pocket.

Trooper Moore's explanation of his reasons for believing a weapon might be causing the bulge in Roggeman's pocket was not particularly articulate, but the trooper never backed away from the thrust of his entire testimony: that upon seeing the bulge in Roggeman's pocket, he was concerned that Roggeman might be carrying a weapon. Terry does not require the law-enforcement officer performing the search to state the reasons justifying the search articulately, only that such reasons be articulable. See United States v. Tharpe, 536 F.2d 1098, 1101 (5th Cir. 1976) (en banc) ("Terry cannot be read to condemn a pat-down search because it was made by

_____

than he has got an object in his pocket, am I right?

A.     That's correct. Yes.

Tr. at 39-40.

an inarticulate policeman . . . , so long as it is clear that he was aware of specific facts which would warrant a reasonable person to believe he was in danger."), overruled in part on other grounds, United States v. Causey, 834 F.2d 1179 (5th Cir. 1987) (en banc). Here, the facts and circumstances would have justified a reasonable officer in believing that the bulge might be a weapon, and that is all that Terry and its progeny require.

Because the initial pat-down was limited to the right-front-pocket area where Trooper Moore saw the bulge, the search was reasonable in scope, and for the reasons we already have given, was supported by an objectively reasonable, articulable suspicion that the bulge might have been caused by a weapon in Roggeman's pocket. Accordingly, the search and the resulting seizure of evidence were reasonable, and none of Roggeman's Fourth Amendment rights were violated.

## III.

For the reasons stated, the District Court's order granting Roggeman's motion to suppress all the seized evidence is reversed, and the case is remanded for further proceedings consistent with this opinion.

HEANEY, Circuit Judge, dissenting.

I agree with the majority's conclusion that all relevant circumstances must be considered when determining whether Trooper Moore had a reasonable suspicion to pat-down Roggeman's right-front pants pocket. Moreover, because I am convinced that this is precisely what the district court did in suppressing the fruits of the search, I would affirm.

The district court determined that the circumstances surrounding Trooper Moore's pat-down search did not provide reasonable, articulable suspicion to justify

-17-

the search. At the suppression hearing, Trooper Moore failed to provide any information that would justify rejecting this assessment. When Roggeman was stopped, the scene of the stop was poorly lit, and Trooper Moore testified that he could not see the bulge in Roggeman's pants clearly enough to suspect that it was a weapon. Specifically, when Trooper Moore was asked why he believed Roggeman had a weapon in his right front pocket, he replied as follows:

> A: I didn't know what the object was. I wanted to know because it was dark and it is hard to visually observe what things are in the dark.

> Q: Okay. So . . . [w]ould I be correct if I said your testimony was that you had no reason to believe it was a weapon, but you were curious as to what it was? Would that be fair?

> A: Yes, sir.

Transcript at p. 23.

Later, when Trooper Moore was asked why he thought the bulge in Roggeman's pocket might be a weapon, he responded: "[I]t was concealed in his pocket. I was curious as to what it was." Id. at 39. Thereafter, Trooper Moore admitted that the only reason he suspected Roggeman of carrying a weapon was because he had an object in his pocket. Id. at 40.

The majority has thoroughly reviewed Trooper Moore's testimony, and has determined that Trooper Moore unequivocally testified that he believed the bulge in Roggeman's pocket might have been a weapon. I must respectfully disagree with the majority's assessment of the testimony. At various times during his testimony, Trooper Moore indicated that the size and shape of the bulge in Roggeman's pocket led him to conclude that the bulge might be a weapon. Yet, at other times, Trooper Moore indicated that he couldn't clearly see the bulge, and that he had no reason to suspect that a weapon was present. Even when asked directly, Trooper Moore failed

-18-

to indicate why the size and shape of the bulge led him to conclude it could have been a weapon, other than to vaguely assert that his training and experience led him to conclude that it "possibly could" be a weapon. Tr. at 39-40. Despite the uncertain nature of Trooper Moore's testimony, the majority asserts that he "was unequivocal that he believed the bulge could have been caused by a weapon" and that any statements indicating otherwise were meant to "disclaim[] that he had possessed actual knowledge that the bulge was a weapon." I cannot accept the majority's analysis. Trooper Moore's testimony, when read as a whole, was equivocal. At times Trooper Moore stated that he believed Roggeman might be armed, while at other times he indicated that he did not have any reason to believe that Roggeman was armed, and that he was merely curious as to what was in Roggeman's pants. Therefore, there is no reason to conclude that the district court's analysis of the import of this testimony was clearly erroneous.

In my view, the passages cited above represent the crux of Trooper Moore's testimony: it was dark; Trooper Moore saw a small bulge in Roggeman's pants pocket; he didn't know what the bulge was; he was curious because it theoretically could have been a weapon; but, he did not observe anything specific to cause him to suspect that the bulge was being created by a weapon.

The Supreme Court has made clear that an officer's "reasonable belief" that a suspect is armed and dangerous must be based on "specific and articulable" facts before he conducts a pat-down search. Terry v. Ohio, 392 U.S. 1, 21 (1968). None of the cases cited by the majority, including Mimms, indicate that the presence of a small amorphous bulge in the front pocket of a pair of pants, alone, provides reasonable suspicion that a suspect is armed. Cf. Pennsylvania v. Mimms, 434 U.S. 106, 107 (1977) (noting that a **large** bulge in jacket of a suspect permitted an officer to conclude that the suspect was armed, justifying a pat-down search); United States v. Baker, 78 F.3d 135, 136-137 (4th Cir. 1996) (noting that an officer had a reasonable belief that a bulge in a suspect's waistband could have been made by a

-19-

weapon when the officer clearly observed a "**triangular shaped bulge** underneath the front of [the suspect's] shirt, **near the waistband of his pants**") (emphasis added); United States v. Brooks, 2 F.3d 838, 841-842 (8th Cir. 1993)(holding that officers had a reasonable, particularized suspicion to conduct a pat-down search when they observed a noticeable bulge in the right front pants pocket of an individual **who was suspected of participating in a recent armed robbery**); United States v. $84,000 United States Currency, 717 F.2d 1090, 1097-1099 (7th Cir. 1983) (holding that a pat-down search was justified when officers observed a bulge in the top of a suspect's boot because the bulge was in area where "weapons are often secreted;" the suspect's appearance and conduct conformed with a DEA drug courier profile; the suspect exhibited "furtive and anxious movement" throughout an airport terminal; and the officers were alone with the suspect and his accomplice in a "compact, dark non-public area illuminated only by 'Exit' signs"); United States v. Elsoffer, 671 F.2d 1294, 1295, 1299 (11th Cir. 1982) (holding that officers had probable cause to arrest an individual in an airport because the individual had a bulge "shaped like a good-sized softbound book on the front of [his] trousers from waistline to crotch").

The facts of the cases cited above are distinguishable from the facts of this case. The bulge in Roggeman's pants was small, and located in his front pocket, not in an area where a gun would commonly be concealed, such as the waistband of his pants, his jacket, or the top of his boot. Roggeman was not suspected of anything other than driving a car with a faulty muffler. He was not acting suspiciously. By itself, the simple observation of the bulge in Roggeman's pocket did not provide reasonable suspicion to conduct a pat-down search. Something more was needed, as almost everyone carries something in their pocket. A subjective suspicion premised upon a particular officer's training and experience is not enough. See U.S. v. Campbell, 843 F.2d 1089, 1093-94 (8th Cir. 1988) ("[O]fficers must be acting on facts directly relating to the suspect or the suspect's conduct and not just on a 'hunch' or on circumstances which 'describe a very broad category of predominantly innocent travelers'") (citation omitted); Baker, 78 F.3d at 137 ("An officer's belief must be

based not on subjective hunches but on information sufficient to cause a reasonably prudent person under the circumstances to believe that either his safety or that of others is in danger") (citations omitted).

Here, the record is devoid of any facts which would suggest to a reasonably prudent person that the bulge was a concealed weapon. I do not believe that we have come to the point in this country where simply carrying a small object in one's pants pocket should justify being subjected to pat-down searches by law enforcement personnel. Therefore, I must dissent.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.