# United States Court of Appeals
### For the Eighth Circuit

_____

No. 14-1421
_____

United States of America

*Plaintiff - Appellee*

v.

Adam Robert Chartier

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Northern District of Iowa - Cedar Rapids

_____

Submitted: October 10, 2014
Filed: November 26, 2014

_____

Before RILEY, Chief Judge, WOLLMAN and BYE, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Adam Chartier entered a conditional plea of guilty to possession of pseudoephedrine knowing or having reasonable cause to believe that it would be used to manufacture methamphetamine, in violation of 21 U.S.C. § 841(c)(2). On appeal,

Chartier contends that the district court[1] erred in denying in part his motion to suppress evidence. We affirm.

## I. Background

On December 7, 2012, at approximately 11:00 p.m., Officer Erik Naaktgeboren of the Hiawatha Police Department was conducting routine patrol when he observed a blue Mercury Grand Marquis. After running the vehicle's license plate, he learned that the registered owner—a white male—did not have a currently valid driver's license. It was dark, snowing, and misting. From his location behind the Grand Marquis, Naaktgeboren was able to see two heads above the seats' headrests, but the two-lane road he was on prevented him from pulling up next to the vehicle to determine whether the driver was the registered owner.

Naaktgeboren initiated a traffic stop and approached the vehicle. A woman was in the driver's seat. While speaking with her, Naaktgeboren noticed a bottle of muriatic acid in the backseat and a Walmart bag and package of airline tubing tucked under the front passenger's leg. Because Naaktgeboren had been trained and certified by the Drug Enforcement Administration as a clandestine laboratory technician for dismantling and processing methamphetamine labs, he recognized the acid and tubing as items regularly used in manufacturing methamphetamine. After checking the occupants' identification cards, he identified the driver as Aubree Sivola and the passenger as Adam Chartier. Naaktgeboren testified that he remembered previously having heard Chartier's name mentioned as someone who was involved with methamphetamine manufacturing. Naaktgeboren requested that another officer assist him at the scene. He then learned from dispatch that Sivola had a valid license to drive. When the back-up officer arrived, Naaktgeboren requested that Sivola step out

---

[1]The Honorable Linda R. Reade, Chief Judge, United States District Court for the Northern District of Iowa.

of the vehicle and asked her where she and Chartier had been. She responded that they were coming from a Walmart store. Naaktgeboren asked Sivola what they had purchased at Walmart, and she replied that they had not purchased anything there. This response seemed suspicious to Naaktgeboren, since he had seen a Walmart bag in the car, so he began to inquire about whether there were any illegal drugs in the car and indicated that he would be walking his drug-detection dog around the vehicle. Sivola then consented to a brief pat-down and showed Naaktgeboren her pockets.

Dispatch had informed Naaktgeboren that Chartier had a prior incident on his record involving assault with a weapon. Naaktgeboren requested that Chartier step out of the vehicle and noticed bulges in his pockets when Chartier did so. Although Chartier refused to consent to a protective search, Naaktgeboren proceeded to pat him down. During the pat-down, Naaktgeboren felt a package of hypodermic needles in Chartier's pocket and asked him to remove the package and place it on the trunk of the Grand Marquis. Naaktgeboren then walked his drug-detection canine, Reso, around the vehicle. Reso alerted at the passenger-side door. Naaktgeboren searched the vehicle and did not find any contraband. Naaktgeboren then searched Chartier's person, notwithstanding Chartier's renewed refusal to consent to the search. Naaktgeboren seized several small plastic baggies that contained methamphetamine, a yellow drill bit case with pseudoephedrine pills in it, and a pipe, and Chartier was arrested.

Chartier was indicted on Count I of possession of pseudoephedrine knowing or having reasonable cause to believe that it would be used to manufacture methamphetamine, 21 U.S.C. § 841(c)(2), and Count II of attempted manufacture of methamphetamine, id. §§ 841(a)(1), 841(b)(1)(C), 846. After moving to suppress evidence from the traffic stop, Chartier entered a conditional plea of guilty to Count I, preserving his right to withdraw the plea if the court suppressed the evidence and preserving his right to appeal from any denial of his suppression motion. The district

court accepted Chartier's guilty plea, denied in part his motion to suppress, dismissed Count II, and sentenced him to 113 months' imprisonment.

## II. Discussion

"When reviewing the denial of a motion to suppress, we review questions of law *de novo* and the district court's factual findings for clear error." United States v. Zamora-Lopez, 685 F.3d 787, 789 (8th Cir. 2012).

### A. Lawfulness of the Initial Traffic Stop

Chartier contends that the initial traffic stop was unlawful under the Fourth Amendment. We disagree.

A traffic stop is a seizure subject to the Fourth and Fourteenth Amendments' protections against unreasonable searches and seizures. Delaware v. Prouse, 440 U.S. 648, 653 (1979). "Under the Fourth Amendment, a traffic stop is reasonable if it is supported by either probable cause or an articulable and reasonable suspicion that a traffic violation has occurred." United States v. Washington, 455 F.3d 824, 826 (8th Cir. 2006). If there is an "articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered," a traffic stop on that basis is not unreasonable under the Fourth Amendment. Prouse, 440 U.S. at 663.

Naaktgeboren stopped the vehicle only after he ran the information from the license plate and determined that the vehicle's owner did not have a currently valid license to drive. Chartier suggests that Naaktgeboren could not conduct a traffic stop on that basis because the actual driver of the vehicle was female and easily visibly distinguishable from the male registered owner. But only the back of the driver's head was visible through the Grand Marquis's rear window. It was dark, weather conditions were poor, and there was no passing lane that Naaktgeboren could use to

pull up safely alongside the vehicle to identify the driver. Given the road and weather conditions, the Fourth Amendment did not require that Naaktgeboren affirmatively identify the sex of the driver or further investigate the driver's physical appearance before initiating a traffic stop. Thus, Naaktgeboren had an articulable and objectively reasonable suspicion that a motorist without a valid license was driving the vehicle, and his decision to initiate a traffic stop did not violate the Fourth Amendment.

## B. Expansion of the Traffic Stop

Chartier contends that the duration and scope of the traffic stop were unreasonably extended beyond the range permitted by the Fourth Amendment. We disagree.

"A constitutionally permissible traffic stop can become unlawful . . . 'if it is prolonged beyond the time reasonably required to complete' its purpose." United States v. Peralez, 526 F.3d 1115, 1119 (8th Cir. 2008) (quoting Illinois v. Caballes, 543 U.S. 405, 407 (2005)). An officer may detain the occupants of a vehicle while completing routine tasks related to the traffic violation, such as asking for license and registration or inquiring about the occupants' destination, route, and purpose. Id. If, during the course of completing these routine tasks, "the officer develops reasonable suspicion that other criminal activity is afoot, the officer may expand the scope of the encounter to address that suspicion." Id. at 1120. In determining whether reasonable suspicion exists, we look at the totality of the circumstances, and "[t]his process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)).

Once Naaktgeboren saw the muriatic acid and airline tubing in the vehicle, he had the reasonable suspicion necessary to expand the scope of the traffic stop and

make further inquiry to determine whether the items had been purchased for the purpose of manufacturing methamphetamine.[2] Although the presence of these two items might not have alerted an untrained person to the possibility that criminal activity was afoot, Naaktgeboren's expertise with processing and dismantling methamphetamine laboratories allowed him to recognize that these items often were used together for criminal purposes. Furthermore, Naaktgeboren previously had heard two people mention Chartier's name as someone involved in methamphetamine manufacturing. Naaktgeboren's suspicions grew—and reasonably so—when, in response to his question regarding what they had purchased at Walmart, Sivola stated that they had not bought anything there. Considering that Naaktgeboren had seen a Walmart bag tucked under Chartier's leg, this response was peculiar, suggested a possible cover-up, and thus made it more likely that the items purchased were intended to be used for methamphetamine manufacturing. See United States v. Stewart, 631 F.3d 453, 458 (8th Cir. 2011) (noting that even minor inconsistencies may heighten an officer's reasonable suspicion). These facts, taken together, gave Naaktgeboren a particularized and objective basis to extend the scope and duration of the traffic stop and to walk Reso around the vehicle.

## C. Pat-Down Search

Chartier contends that the protective pat-down search was unlawful because it was not supported by reasonable suspicion that he was armed or dangerous. We disagree.

---

[2]We note that the Supreme Court has recently granted certiorari in a case in which we held that a "de minimis" delay of seven or eight minutes to conduct a dog sniff after the completion of a traffic stop did not violate the Fourth Amendment. See United States v. Rodriguez, 741 F.3d 905 (8th Cir. 2014), cert. granted, 83 U.S.L.W. 3183 (U.S. Oct. 2, 2014) (No. 13-9972). Because Naaktgeboren had the reasonable suspicion necessary to extend the duration of the traffic stop once he saw the acid and tubing in the vehicle, there is no "de minimis" delay issue before us in the present case.

If during the course of a justified traffic stop an officer has "a reasonable, articulable suspicion that [a] person may be armed and presently dangerous[,]" then the officer is "justified in making a limited, warrantless search for the protection of himself or others nearby in order to discover weapons[.]" United States v. Roggeman, 279 F.3d 573, 577 (8th Cir. 2002) (citing Terry v. Ohio, 392 U.S. 1, 30 (1968)).  At the time he performed the protective search, Naaktgeboren was aware that Chartier had a prior incident involving assault with a weapon, and, as explained above, Naaktgeboren had a reasonable suspicion that Chartier was involved with drug manufacturing.  These factors support the reasonableness of Naaktgeboren's decision to perform a protective search.  See Stewart, 631 F.3d at 457 (concluding that an officer's awareness of prior violent and drug-related behavior supports reasonable suspicion for purposes of a protective search); United States v. Brown, 913 F.2d 570, 572 (8th Cir. 1990) ("Since weapons and violence are frequently associated with drug transactions, the officers reasonably believed that the individuals with whom they were dealing were armed and dangerous.").  Furthermore, Naaktgeboren observed a bulge in Chartier's coat pockets, and that bulge could have indicated the presence of a weapon.  See Roggeman, 279 F.3d at 579 (noting that a bulge is a substantial factor in justifying a protective search).  Considering these facts in combination, the protective search did not run afoul of the Fourth Amendment.

## D. Search after Canine Alert

Lastly, Chartier contends that there was no probable cause to search him after Reso alerted to the vehicle and the vehicle search proved fruitless.  We conclude that the search was permissible.

Under the Fourth Amendment, "a warrantless search of the person is reasonable only if it falls within a recognized exception" to the warrant requirement.  Missouri v. McNeely, 133 S. Ct. 1552, 1558 (2013).  "Among the exceptions to the warrant requirement is a search incident to a lawful arrest."  Arizona v. Gant, 556 U.S. 332,

338 (2009). Such a search may include a search of the arrestee's person to remove weapons and seize evidence to prevent its concealment or destruction. Id. at 339 (citing Chimel v. California, 395 U.S. 752, 763 (1969)). Whether the search of Chartier's person falls within the search-incident-to-arrest exception thus turns on whether there was probable cause for Chartier's arrest. Probable cause exists at the time of arrest if the totality of the circumstances known to the officers involved is "sufficient to warrant a prudent person's belief that the suspect had committed or was committing an offense." United States v. Mendoza, 421 F.3d 663, 667 (8th Cir. 2005) (quoting United States v. Cabrera-Reynoso, 195 F.3d 1029, 1031 (8th Cir. 1999)). A dog sniff by a reliable drug dog that results in an alert on a vehicle gives an officer probable cause to believe there are drugs present. United States v. Donnelly, 475 F.3d 946, 955 (8th Cir. 2007). The only question, then, is whether Reso's alert on the vehicle was sufficient to establish probable cause that Chartier himself possessed, or had possessed, illegal drugs.[3]

First, the fact that Reso alerted to the vehicle, coupled with the fact that a thorough search of the vehicle revealed no obvious source of the scent to which he alerted, made it more likely that the scent had come from one of the vehicle's occupants. See United States v. Anchondo, 156 F.3d 1043, 1045 (10th Cir. 1998) ("Even if the subsequent fruitless search of the car diminished the probability of contraband being in the car, it increased the chances that whatever the dog had alerted to was on the defendants' bodies."). The occupants of the Grand Marquis had only recently exited the vehicle. The scent of drugs can be transferred from a person's body to a vehicle, and a "well-trained drug-detection dog *should* alert to such odors[.]" Florida v. Harris, 133 S. Ct. 1050, 1059 (2013). Naaktgeboren had already found muriatic acid and airline tubing in the car, as well as a package of needles on Chartier's person. Furthermore, given that Reso specifically alerted outside the passenger door, where Chartier had been sitting, and that Sivola had already shown

---

[3]Chartier has not challenged Reso's reliability as a drug-detection canine.

Naaktgeboren the contents of her pockets, the totality of the circumstances known to Naaktgeboren was sufficient to warrant a reasonable belief that Chartier possessed or had possessed illegal drugs on his person. Naaktgeboren thus had probable cause to arrest Chartier, rendering his pre-arrest search of Chartier's person lawful.

Chartier argues that it was not until Naaktgeboren found the drugs in his pockets that he was subject to arrest and that the drugs found after the search could not retroactively justify the search. True it is that the fruits of a search incident to arrest that precedes the arrest may not serve as the justification for the arrest. Sibron v. New York, 392 U.S. 40, 63 (1968). Here, however, probable cause for arrest existed even before the search, and since "the formal arrest followed quickly on the heels of the challenged search of [Chartier's] person, we do not believe it particularly important that the search preceded the arrest rather than vice versa." Rawlings v. Kentucky, 448 U.S. 98, 111 (1980). Thus the search of Chartier's person did not violate his constitutional rights.

## III. Conclusion

The order denying the motion to suppress is affirmed.

_____