# United States Court of Appeals

### For the Eighth Circuit

_____

No. 20-1285

_____

United States of America

*Plaintiff - Appellee*

v.

Willie Israel Navarette

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of North Dakota - Bismarck

_____

Submitted: February 19, 2021
Filed: May 6, 2021

_____

Before LOKEN, BENTON, and KELLY, Circuit Judges.

_____

KELLY, Circuit Judge.

Based on evidence discovered during a traffic stop, Willie Navarette was indicted for and eventually convicted of possessing a firearm and ammunition after having been convicted of a felony. 18 U.S.C. §§ 922(g)(1), 924(a)(2). On appeal, he

argues that the district court[1] erred in denying his motion to suppress and in allowing the government to use his testimony from the suppression hearing at trial. We affirm.

## I.

In the early hours of May 30, 2018, Sergeant Kristiina Ravaska of the Williston Police Department was on patrol in Williston, North Dakota. At 1:57 am, she noticed a blue Dodge Durango with its driver's side headlamp out and initiated a traffic stop. After the driver pulled over, Sergeant Ravaska approached the driver's side window, where she found Navarette alone in the car. She requested his driver's license, proof of insurance, and registration information. Navarette responded that he did not have any of these documents but provided her with his name and date of birth. Sergeant Ravaska returned to her patrol car to run Navarette's information. As she did so, Officer Jason Barten arrived on the scene. Though Sergeant Ravaska was unable to find any record of a driver's license in Navarette's name, she learned that he was on federal probation. Sergeant Ravaska then returned to Navarette and told him she could not find his driver's license information. In her account at the suppression hearing, which the district court credited, she noticed Navarette making a "patting motion on his pockets" and "asked him if he'd be willing to step out and check his person to see if his driver's license was in his pockets or on his person or anywhere."[2] Navarette opened the door and stepped out of the car; as he did so, Sergeant Ravaska noticed a loaded gun magazine in the pocket of the door. By her estimation, this happened around 2:12 am, 15 minutes into the stop.

---

[1]The Honorable Daniel L. Hovland, United States District Judge for the District of North Dakota.

[2]Navarette testified at the suppression hearing that Sergeant Ravaska ordered him out of the vehicle more forcefully.

Once Navarette was out of the car, Sergeant Ravaska asked him what he was on federal probation for, and he said, "a weapons violation." She also asked about the magazine and whether it was a violation of the terms of his supervision to possess it. He replied that he didn't know whether it was a violation and hadn't known that the magazine was in the car, as he had purchased the vehicle only a couple of days prior. As Navarette was speaking, Sergeant Ravaska noticed that he "kind of started moving towards the driver's side" of the car and became concerned he might be trying to get back in the driver's seat. At approximately 2:18 am, she took hold of his wrist and informed him that she was detaining him.

With the assistance of Officer Barten, Sergeant Ravaska handcuffed Navarette. She advised Navarette of his Miranda rights and received confirmation that he understood them. Then, after obtaining his consent, she patted him down and discovered an empty leather holster on his belt. During this time, Officer Barten was by the open driver's side door, looking inside the car with his flashlight. From that position, Officer Barten observed a handgun between the driver's seat and the center console. A further search of the car revealed two more guns covered by clothing and a few boxes of ammunition inside a bag in the backseat, as well as mail addressed to Navarette. Upon completion of the search, Sergeant Ravaska placed Navarette under arrest.

Following his arrest, Navarette was indicted on one count of possessing a firearm and ammunition after having been convicted of a felony. He moved to suppress evidence obtained from the May 30 stop, arguing that it was seized as the result of an unlawful search. The district court held a suppression hearing, where both Sergeant Ravaska and Navarette testified. As is relevant here, Navarette explained that he had purchased the Dodge Durango two days before he was pulled over. He said that he bought it from a seller he didn't know and that the seller did not provide him with a title to the car. Navarette claimed that he had not previously experienced problems with the headlights. He added that he knew they were working

properly the night Sergeant Ravaska pulled him over because he saw them while getting in and out of the car to visit convenience stores earlier in his drive. The district court denied the motion to suppress.

Navarette's case then proceeded to trial, where the main issue was whether he knowingly possessed the firearms and ammunition at issue. Navarette's defense was that he was unaware that the firearms and ammunition were in the car and so was not in knowing possession of them. He took the stand in his own defense and testified that, on the night of May 30, 2018, he went to the house of a friend of a friend who was selling a Dodge Durango. Navarete was interested in purchasing the vehicle but wanted to test drive it first. He explained that the car was messy and poorly lit when he first saw it, that he did not inspect the interior, and that he took his jacket off after he got in for the test drive and put it over the center console, which may have obscured his view of the gun that was later discovered there. In his account, he got into the car for the test drive without knowing of its contents. He had been driving the car for only 15 minutes, he claimed, when Sergeant Ravaska pulled him over. He said that he never told Sergeant Ravaska that he had purchased the car two days earlier (as she testified) and denied knowledge of any of the firearms and ammunition it contained.

On cross examination, the prosecutor inquired about a number of statements Navarette made under oath during his suppression hearing that conflicted with his testimony at trial. The prosecutor asked if he remembered his previous testimony that he had purchased the car two days prior to his arrest. He also asked Navarette if he recalled testifying that he inspected the car before purchasing it and that he had been driving for some time and had visited at least two convenience stores before he was pulled over. Navarette responded that he remembered making those statements. His counsel made no objection to the prosecutor's line of questioning.

During his closing argument, Navarette's attorney maintained that Navarette did not knowingly possess the firearms and ammunition at least in part because he was simply test driving the car and did not know what was in it. The prosecutor directed the jury to the evidence it believed proved Navarette's knowing possession, including Sergeant Ravaska's account of her conversation with Navarette during the traffic stop, during which he told her that he had bought the car two days earlier. In addition, the prosecutor highlighted Navarette's testimony at trial that the car didn't belong to him and told the jury, "[I]n considering whether you believe that testimony, you can consider . . . whether that witness said something different at an earlier time and the general reasonableness of the testimony in light of all the evidence and any other factors that bear on credibility." The prosecutor then listed the ways in which Navarette's testimony at trial contradicted his testimony at the suppression hearing.

The jury returned a guilty verdict on the count charged, and Navarette now appeals.

II.

A.

Navarette first argues that the district court erred in denying his motion to suppress, contending that his stop was unnecessarily prolonged and became an arrest unsupported by probable cause. We review the district court's factual findings for clear error and its legal conclusions de novo. United States v. Morris, 915 F.3d 552, 555 (8th Cir. 2019).

"Because it is subject to Fourth Amendment protections against unreasonable searches and seizures, a traffic stop must be supported by either reasonable suspicion or probable cause" to believe that the driver has committed a traffic violation. United States v. Soderman, 983 F.3d 369, 374 (8th Cir. 2020). A traffic stop supported by

probable cause or reasonable suspicion may nonetheless violate the Fourth Amendment if it lasts longer than necessary to effectuate its "mission—to address the traffic violation that warranted the stop and attend to related safety concerns." Rodriguez v. United States, 575 U.S. 348, 354 (2015) (internal citation omitted). "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to the traffic stop,'" such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Id. at 355 (quoting Illinois v. Caballes, 543 U.S. 405, 408 (2005)). When complications arise carrying out these tasks, "police may reasonably detain a driver for a longer duration than when a stop is strictly routine." United States v. Olivera-Mendez, 484 F.3d 505, 510 (8th Cir. 2007). But absent reasonable suspicion of separate criminal conduct, "an officer may not conduct unrelated checks that extend the stop beyond the time reasonably required to complete its original mission." Soderman, 983 F.3d at 374.

Sergeant Ravaska pulled Navarette over because she saw him driving without a functioning headlamp. She spent the first 21 minutes of the stop attempting to confirm Navarette's identity, talking to him about the traffic violation and why he did not have a driver's license, registration, or proof of insurance, and offering suggestions that would help him locate his license. All of these tasks were within the mission of "address[ing] the traffic violation that warranted the stop," Rodriguez, 575 U.S. at 354, and did not unnecessarily prolong Navarette's detention. While it may not always take an officer 21 minutes to address a traffic violation, the duration here was justified by Navarette's inability to produce the basic identifying information Sergeant Ravaska requested and the time it took for her to address this issue. Up to the point at which Sergeant Ravaska handcuffed Navarette, the stop was not unlawfully extended beyond its traffic-related purposes.

By the time Sergeant Ravaska handcuffed Navarette, however, she had moved beyond addressing Navarette's traffic offense and begun investigating "ordinary

criminal wrongdoing." Rodriguez, 575 U.S. at 355 (quoting City of Indianapolis v. Edmond, 531 U.S. 32, 40–41 (2000)).  Such an investigation must be supported by reasonable suspicion or probable cause to believe that other crimes have occurred. Rodriguez, 575 U.S. at 355 (holding that any investigation "aimed at detecting evidence of ordinary criminal wrongdoing" that prolongs a traffic stop requires "the reasonable suspicion ordinarily demanded to justify detaining an individual" (cleaned up)); see also United States v. Chartier, 772 F.3d 539, 543 (8th Cir. 2014) ("If, during the course of completing [routine tasks related to a traffic violation], the officer develops reasonable suspicion that other criminal activity is afoot, the officer may expand the scope of the encounter to address that suspicion." (cleaned up)).  At this point, Sergeant Ravaska knew that Navarette was on federal probation for a firearm offense, and she had seen a loaded gun magazine in plain view in the pocket of the driver's side door.  A reasonable officer in her position could have concluded, despite Navarette's denials, that the magazine in the door was his and that the terms of his probation likely prohibited him from possessing firearms and ammunition.  Cf. United States v. Blom, 242 F.3d 799, 808 (8th Cir. 2001) ("A state police officer who knew Blom was a convicted felon would likely know it was a federal crime for him to possess ammunition.").  Accordingly, her extension of the stop was properly supported by "reasonable suspicion that other criminal activity [was] afoot." Chartier, 772 F.3d at 543; see United States v. Smith, 648 F.3d 654, 658 (8th Cir. 2011) ("Reasonable suspicion requires that the officers' suspicion be based upon particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime has been committed." (cleaned up) (quoting United States v. Lopez-Mendoza, 601 F.3d 861, 865 (8th Cir. 2010)).

Because the stop at no point fell afoul of the Fourth Amendment, the district court did not err in denying Navarette's motion to suppress the evidence gathered from it.

B.

Navarette additionally argues that the district court erred in allowing the government to use his testimony from the suppression hearing to cross examine him at trial. Because he did not object at the time, we review the district court's decision for plain error. United States v. Oslund, 453 F.3d 1048, 1059 (8th Cir. 2006). Navarette therefore must show "(1) error, (2) that is plain, (3) that affects substantial rights, and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings." United States v. Bonnell, 932 F.3d 1080, 1082 (8th Cir. 2019) (per curiam) (cleaned up).

In Simmons v. United States, 390 U.S. 377 (1968), the Supreme Court held that "when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection." Id. at 394. While this rule indisputably applies in instances in which the government attempts to use a defendant's suppression hearing testimony against him as substantive evidence of his guilt, neither the Supreme Court nor this circuit has determined whether such testimony can be used at trial for the purpose of impeachment. See United States v. Salvucci, 448 U.S. 83, 93–94 (1980) ("This Court has not decided whether Simmons precludes the use of a defendant's testimony at a suppression hearing to impeach his testimony at trial."). A number of other circuits have weighed in on the issue, however, and concluded that Simmons does allow this use. See, e.g., United States v. Jaswal, 47 F.3d 539, 543 (2d Cir. 1995) (per curiam); United States v. Beltran-Gutierrez, 19 F.3d 1287, 1291 (9th Cir. 1994); United States v. Quesada-Rosadal, 685 F.2d 1281, 1283 (11th Cir. 1982).

Here, Navarette testified at trial that he was just test driving the car when Sergeant Ravaska pulled him over and was unaware of the firearms it contained. In response, the government confronted Navarette with contradictory statements he

made at the suppression hearing about whether he purchased the car and how long he had been driving it that night and asked if he remembered making those statements. The government did not attempt to use these earlier statements "on the issue of guilt," Simmons, 390 U.S. at 394, or to prove that his account from the suppression hearing represented what actually happened. Rather, it introduced his earlier statements to undermine the jury's confidence in Navarette as a witness—a purpose confirmed during its closing argument, where it listed the contradictions only in the context of urging the jury to consider Navarette's credibility. Cf. Beltran-Gutierrez, 19 F.3d at 1289–90 (considering the government's closing argument to help determine whether its use of prior inconsistent statements from a suppression hearing was for impeachment purposes). The government's use of Navarette's suppression hearing testimony is therefore best considered impeachment evidence. In light of this circuit's silence on whether Simmons permits such a use and the affirmative answer from other circuits that have addressed the question, we cannot say the district court's decision to allow the government to impeach Navarette at trial with his prior testimony was plainly erroneous. Navarette's argument on appeal is therefore unavailing.

III.

We affirm the judgment of the district court.

_____