816 A.2d 901

**Deshawn RANSOME**

v.

**STATE of Maryland.**

**No. 19, Sept. Term, 2002.**

Court of Appeals of Maryland.

Feb. 14, 2003.

Sherrie B. Glasser, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for Petitioner.

Gary E. Bair, Solicitor General (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for Respondent.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

WILNER, Judge.

The State of Maryland contends that it is permissible for a police officer who observes a man doing nothing more than standing on a sidewalk on a summer night talking with a friend, to stop and frisk that person because (1) they were in a high-crime area, (2) the man had a bulge in his front pants pocket, (3) the man gazed at the unmarked police car containing three plain-clothed officers as it drove by and slowed to a stop, and (4) when the three officers got out of the car, approached the man, identified themselves as police officers, and one began to ask him questions, the man appeared nervous and avoided eye contact with the officer. The State is wrong. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) does not go quite that far.

## BACKGROUND

The relevant facts, taken from testimony presented at a suppression hearing, are essentially undisputed. At around 11:20 p.m. on July 28, 2000, Officer Javier Moro and two other officers were cruising in an unmarked police car along the 100 block of North Decker Street in Baltimore City—an area that

had produced numerous complaints of narcotics activity, discharging of weapons, and loitering. They were looking for "loitering activity, congregation on vacant steps, [and] loud groups of people hanging around the corners." As they proceeded down the street, Moro noticed petitioner, Deshawn Ransome, with another man, either standing or walking on the sidewalk. Moro did not know petitioner or the other man and did not see them do anything unusual—petitioner did not reach into his pocket or exchange anything with the other man. They were not loitering or congregating on steps, and there is no evidence that they were loud or boisterous or hanging around a corner. They were simply there.

As the car approached the pair, it slowed to a stop and petitioner turned to look at the car. Officer Moro, for some reason, regarded that as suspicious. He also noted that petitioner had a large bulge in his left front pants pocket, which Moro took as an indication that petitioner might have a gun. The three officers promptly exited the car, and Moro approached petitioner. A second officer engaged the other man while the third remained close by observing both encounters. Moro said that *"based upon the bulge,* I was going to conduct a stop and frisk," but he decided to ask petitioner some questions first, "to buy me time to feel him out." (Emphasis added). He asked petitioner first whether Moro could talk to him, to which petitioner gave no response. He then asked petitioner's name and address, which petitioner gave. The address was about six or seven blocks away. Both answers were truthful.

At that point, pursuant to his admitted intention, Moro directed petitioner to place his hands on top of his head and proceeded to pat down his *waist* area—not the pocket area where he had noticed the bulge. That was the moment, according to Officer Moro, that petitioner was no longer free to leave. Moro detected a small bulge, which he suspected was a controlled dangerous substance, and that led him to search further. When he discovered a bag of marijuana in the waist area, he placed petitioner under formal arrest and continued his search incident to that arrest. The extended

search revealed that the bulge in petitioner's pants pocket consisted of a roll of money—$946. In other parts of his clothing, Moro found 72 ziplock bags and some cocaine.

Petitioner was charged with simple possession and possession with intent to distribute marijuana and cocaine. Upon the denial of his motion to suppress the evidence taken from him, petitioner proceeded to trial on an agreed statement of facts, was convicted, and was sentenced to 10 years in prison. The Court of Special Appeals affirmed that judgment, and we granted *certiorari* to consider whether Officer Moro had reasonable suspicion to conduct the stop and frisk that led to the discovery of the challenged evidence. Believing that he did not, we shall hold that the evidence was inadmissible and shall therefore reverse the judgment of the intermediate appellate court.

## DISCUSSION

The State does not even suggest, much less argue, that Officer Moro had probable cause to seize and search petitioner. The issue is whether, under the rules of engagement announced in *Terry v. Ohio, supra,* he had reasonable suspicion to frisk petitioner for possible weapons.

Although hundreds—perhaps thousands—of stop and frisk cases have been decided since *Terry* was filed in 1968, the pronouncements in that case still provide both the Constitutional rationale and the basic Constitutional boundaries of the street-encounter stop and frisk, and it is therefore helpful to start by looking at what the Court said there. The stop and frisk in *Terry* took place after a seasoned police officer had observed two men, occasionally joined by a third, pacing back and forth along a short stretch of the street, pausing each time to look into a particular store window. This occurred about a dozen times over a twelve minute period. Suspicious that the men were "casing" the store in preparation for a robbery and concerned that they may therefore be armed, the officer confronted them and patted down their outer clothing, finding

that each was in fact armed. The issue, as here, was the admissibility of the fruits of the pat-down search.

The Court began its analysis by confirming that, although a mere accosting and engagement of a person in conversation may not invoke Fourth Amendment protections, a stop and frisk does—that when the officer grabbed Mr. Terry, there was a Fourth Amendment "seizure," and that when he conducted his pat-down frisk, there was a search. *Terry, supra,* 392 U.S. at 19, 88 S.Ct. at 1879, 20 L.Ed.2d at 904–05. Noting that the Fourth Amendment proscribes "unreasonable" searches and seizures, the Court viewed the question as whether those actions, judged against an objective standard, were reasonable: "would the facts available to the officer at the moment of the seizure or the search 'warrant a [person] of reasonable caution in the belief' that the action taken was appropriate?" *Id.* at 21–22, 88 S.Ct. at 1880, 20 L.Ed.2d at 906 (quoting, in part, *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543, 555 (1925)). In that regard, the Court concluded that:

> "When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm."

*Id.* at 24, 88 S.Ct. at 1881, 20 L.Ed.2d at 908. It iterated that point and restated its conclusion thusly:

> "[T]here must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent [person] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in

danger [citations omitted]. And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which [the officer] is entitled to draw from the facts in light of his experience."

*Id.* at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909. Earlier in the opinion, the Court made clear that, "in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion," noting in a footnote that "[t]his demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence." *Id.* at 21, 88 S.Ct. at 1880, 20 L.Ed.2d at 906.

The case law since *Terry* has refined, in a myriad of contexts, the circumstances under which a seizure actually occurs, when a search exceeds the proper bounds of a *Terry* frisk, and how the factual circumstances known to and articulated by the officer are to be viewed in determining whether they suffice to engender a reasonable suspicion, but the fundamental contours of *Terry* remain in place. *See United States v. Arvizu,* 534 U.S. 266, 273–74, 122 S.Ct. 744, 750–51, 151 L.Ed.2d 740, 749–50 (2002); *Illinois v. Wardlow,* 528 U.S. 119, 123–24, 120 S.Ct. 673, 675–76, 145 L.Ed.2d 570, 575–76 (2000); *Ornelas v. United States,* 517 U.S. 690, 695–96, 116 S.Ct. 1657, 1661, 134 L.Ed.2d 911, 918–19 (1996); *Nathan v. State,* 370 Md. 648, 659–60, 805 A.2d 1086, 1093 (2002); *Cartnail v. State,* 359 Md. 272, 285–86, 753 A.2d 519, 526–27 (2000).

One of the clarifications made by the Supreme Court is that, in determining whether an officer possessed a reasonable suspicion sufficient to justify a stop and frisk, the court must look at the "totality of the circumstances" and not parse out each individual circumstance for separate consideration, *Arvizu, supra,* 534 U.S. at 274, 122 S.Ct. at 751, 151 L.Ed.2d at 750; *United States v. Sokolow,* 490 U.S. 1, 8, 109 S.Ct. 1581,1585, 104 L.Ed.2d 1, 10 (1989), and that it must allow the police officers "to draw on their own experience and special-

ized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Arvizu, supra,* 534 U.S. at 273, 122 S.Ct. at 750–51, 151 L.Ed.2d at 750–51 (quoting, in part, *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 629 (1981)). A factor that, by itself, may be entirely neutral and innocent, can, when viewed in combination with other circumstances, raise a legitimate suspicion in the mind of an experienced officer.

■ Seizing upon that, the State urges that we take into account not only Officer Moro's observation and concern about the bulge in petitioner's left front pocket, but also the fact that this was a high-crime area from which complaints about drug activity, loitering, and shootings had come, that it was late at night and the lighting was poor, that petitioner gazed upon the police car as it approached the pair but then declined to keep eye contact when confronted by Officer Moro, and that petitioner appeared nervous when the officer briefly questioned him. Viewing all of those circumstances together, it argues that Officer Moro had reasonable suspicion to believe that petitioner was armed and dangerous and that the pat-down for weapons was therefore justified.

It is true that, in his testimony at the suppression hearing, Officer Moro noted that the area was a high-crime one, which is why he and his fellow officers were assigned to patrol it. He also recounted that petitioner stopped and looked at the car as it approached, and that, as Moro questioned petitioner, he ceased making eye contact and "his voice was getting real nervous." At one point, he stated that his decision to conduct the frisk was "based upon what I'm seeing with the bulge in his pocket and the way the defendant's mannerism, the way he's talking to me." Although, for purposes of this appeal, we shall assume that all of those circumstances went into the mix, we do pause to note that the extent to which they, or indeed any of them, were truly a factor in the decision to stop and frisk petitioner is not at all clear. In response to questions from the court, Officer Moro stated that his decision to stop

and frisk petitioner was based solely on his observation of the bulge in petitioner's pocket and his immediate conclusion from that bulge that petitioner may be armed. He said first that "based upon just observing the bulge alone of being possibly a hard object or weapon that that would give me enough reasonable suspicion as well as becoming [fearful] of my safety and my other officers, that I had enough to go do a stop and frisk on this gentleman." A moment later, he confirmed that "[b]ased upon the bulge, I was going to conduct a stop and frisk. The reason I asked these questions was just to buy me time to feel him out, but I was—at that point, I was going to do a stop and frisk."[1]

Perhaps in recognition of the central role that the pocket bulge played in Officer Moro's decision to conduct the stop and frisk, the State asks us to look at "the plethora of cases" in which courts have sustained such conduct "in factually similar circumstances." It turns our attention first to *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), which, in its view, stands for the proposition that "a bulge *alone* may justify a frisk." We think that the State gives *Mimms* too expansive a reading.

In *Mimms*, the police observed the defendant driving on an expired tag. They pulled him over and ordered him out of the

---

1. These questions were prompted by Moro's admission that, in preparing his Statement of Probable Cause, he never mentioned anything about eye contact or the lack thereof, about petitioner being nervous, or about his asking petitioner his name or address. In that Statement, Officer Moro noted his observation of the bulge in petitioner's pocket and said that "due to the violent crimes that occur in this block, and the lighting being very poor, this officer became fearful that Mr. Ransome possessed a gun. This officer exited the vehicle to investigate and for officer safety conducted an outer garment patdown." It is of interest that, although Officer Moro recited in his Statement that the lighting was poor, he stated in court that, although the north side of the street was not well lit, the south side, where petitioner was standing, was better lit and that he had no trouble seeing. It is also noteworthy that, although the actual fear expressed by Officer Moro came from the bulge in petitioner's left front pocket, that was not the first place he patted. Moro went, instead, for the petitioner's waist area and, only after finding a soft bulge there and concluding that it likely consisted of a controlled substance, did he search the pocket.

car. As he alighted, they noticed a large bulge under his sport coat, apparently in his waist area, and, fearful that the bulge might be a weapon, patted down that area and discovered a loaded revolver. The Pennsylvania Supreme Court reversed Mimms's conviction for carrying a concealed weapon on the ground that the police had no authority to order Mimms out of the car and that their doing so constituted an impermissible seizure. In a *per curiam* opinion, the Supreme Court reversed that decision, holding that the hazards facing officers when engaged in traffic stops justified the minor intrusion of removing the driver from the car. The Court further concluded that the bulge in the waist area of the jacket permitted the officer to conclude that Mimms was armed and dangerous and that it was therefore reasonable for the officer, in that circumstance, to conduct the pat-down. It is that part of *Mimms* upon which the State relies.

The Court recognized in *Terry* that encounters between the police and citizens "are incredibly rich in diversity," that "[n]o judicial opinion can comprehend the protean variety of the street encounter," and that "we can only judge the facts of the case before us." *Terry, supra,* 392 U.S. at 13, 15, 88 S.Ct. at 1875, 1876, 20 L.Ed.2d at 901, 902; *see also Ornelas, supra,* 517 U.S. at 696, 116 S.Ct. at 1661–62, 134 L.Ed.2d at 919; *Cortez, supra,* 449 U.S. at 417, 101 S.Ct. at 695, 66 L.Ed.2d at 628–29. Gertrude Stein's characterization of the rose does not fit: when judging the facts under the Fourth Amendment *Terry* rubric, we reject the notion that a bulge is a bulge is a bulge is a bulge, no matter where it is, what it looks like, or the circumstances surrounding its observation. We accept, as *Mimms* and our own knowledge of what occurs with alarming frequency on our streets require us to do, that a noticeable bulge in a man's waist area may well reasonably indicate that the man is armed. Ordinarily, men do not stuff bulky objects into the waist areas of their trousers and then walk, stand, or drive around in that condition; regrettably, the cases that we see tell us that those who go armed do often carry handguns in that fashion. We can take judicial notice of the fact, however, that, as most men do not carry purses, they, of

necessity, carry innocent personal objects in their pants pockets—wallets, money clips, keys, change, credit cards, cell phones, cigarettes, and the like—objects that, given the immutable law of physics that matter occupies space, will create some sort of bulge. To apply *Mimms*, which involved a large bulge in the waist area observed upon the stop of a man who had been driving on an expired tag, uncritically to any large bulge in any man's pocket, would allow the police to stop and frisk virtually every man they encounter. We do not believe that *Mimms*, or any other Supreme Court decision, was intended to authorize that kind of intrusion.

There have been, to be sure, many cases in which a bulge in a man's clothing, along with other circumstances, has justified a frisk, and those cases are entirely consistent with *Terry*. *See*, for example, *United States v. Hassan El*, 5 F.3d 726 (4th Cir.1993) (after traffic stop in high-crime area, police observed defendant, a passenger in the car, moving his hands toward a bulge in the center of his waistband); *United States v. Baker*, 78 F.3d 135 (4th Cir.1996) (police stopped car after it ran red light and, together with other cars apparently driving in tandem, took evasive action, observed triangular shaped bulge under front of driver's shirt near waistband of pants, ordered driver to raise shirt and saw gun when he did so); *United States v. $84,000 U.S. Currency*, 717 F.2d 1090 (7th Cir.1983) (defendant, meeting drug courier profile, questioned at airport and admitted his luggage contained some marijuana and cocaine; officer noticed bulge in pants legs near top of boots; patted down for safety); *People v. DeBour*, 40 N.Y.2d 210, 386 N.Y.S.2d 375, 352 N.E.2d 562 (1976) (defendant encountered on deserted street after midnight in mid-October; said he had no identification; police noted waist-high bulge in defendant's jacket; when, at officer's request, defendant unzippered jacket, police saw handgun); *State v. Sleep*, 590 N.W.2d 235 (S.D.1999) (defendant stopped for erratic driving; while he accompanied officer to patrol car, officer noticed bulge in right front pocket and asked if he had a weapon; defendant admitted having a knife and gave it to officer; officer then noticed two bulges in left pocket and when defendant refused to say

what they were, officer patted the area); *Woody v. State,* 765 A.2d 1257 (Del.2001) (defendant spotted with two other men behind residence in high-crime area at 9:30 on January night, ran away when he noticed uniformed officers and was seen clutching bulge in left front coat pocket; when apprehended, police patted area); *State v. Schneider,* 389 N.W.2d 604 (N.D. 1986) (as defendant sat in patrol car awaiting issuance of traffic ticket, officer noticed bulge under defendant's coat that appeared to be a revolver in a shoulder holster and patted the area); *Commonwealth v. Graham,* 554 Pa. 472, 721 A.2d 1075 (1998) (at 1:45 a.m., officer noticed three men on porch of day care center, recognized the men and knew that warrant was outstanding for one of them; as men walked away, officer stopped them, noticed bulge in left front pocket of second man and conducted pat-down); *United States v. Trullo,* 809 F.2d 108, 113–14 (1st Cir.1987) (after observing appellant engage in what officer believed was drug transaction in high-crime area, officer stopped defendant's car and had him get out, in the process noticed bulge in his right front pocket and patted it; court stressed that generalized suspicions about those engaged in drug trade being armed became particularized upon observation of bulge); *United States v. Roggeman,* 279 F.3d 573 (8th Cir.2002) (as defendant was alighting from truck following traffic stop, officer noticed bulge in right front pocket of a size consistent with small caliber handgun).

Each of those cases presents a combination of circumstances justifying a reasonable belief that the bulge noticed by the officer may be a weapon or that criminal activity may be afoot, a combination lacking here. Officer Moro never explained why he thought that petitioner's stopping to look at his unmarked car as it slowed down was suspicious or why petitioner's later nervousness or loss of eye contact, as two police officers accosted him on the street, was suspicious. As noted, *Terry* requires the officer to point to "specific and articulable facts" justifying his conduct. Unlike the defendants in the cited cases, or indeed in *Terry,* petitioner had done nothing to attract police attention other than being on the street with a bulge in his pocket at the same time Officer

Moro drove by. He had not committed any obvious offense, he was not lurking behind a residence or found on a day care center porch late at night, was not without identification, was not a known criminal or in company with one, was not reaching for the bulge in his pocket or engaging in any other threatening conduct, did not take evasive action or attempt to flee, and the officer was not alone to face him.

The Fourth Circuit Court of Appeals made the point quite well in *United States v. Wilson,* 953 F.2d 116 (4th Cir.1991). There, the district court found that an officer had reasonable suspicion to conduct a stop and frisk, based in part upon the observation of a bulge in the defendant's coat pocket. *Id.* at 120. In reversing the district court's refusal to suppress evidence obtained from the frisk, the Court of Appeals stated:

> "The bulge is not the sort of observation that has any significance. A coat pocket is a quite usual location for a bulky object, and there is no indication that Wilson attempted to obscure the agents' view of the bulge. *See United States v. Millan,* 912 F.2d 1014, 1017 (8th Cir.1990) (observation of two bulges in suspect's inner coat pockets not of a suspicious nature). Our decisions that mention bulges as a factor in the reasonable suspicion analysis all involve attempts by a suspect to hide the bulge and/or the observation of a bulge in an unusual location."

*Id.* at 125; *see also United States v. Cooper,* 43 F.3d 140 (5th Cir.1995) ("[w]hile the district court rejected the position that the 'suspicious bulge' was an articulable fact contributing to the officer's reasonable suspicion that criminal activity was afoot, we disagree. A large bulge located in such an unusual place on a suspect may be a factor warranting reasonable suspicion."); *United States v. Powell,* 886 F.2d 81 (4th Cir. 1989); *United States v. Aguiar,* 825 F.2d 39 (4th Cir.1987); *United States v. Lehmann,* 798 F.2d 692 (4th Cir.1986); *United States v. Harrison,* 667 F.2d 1158 (4th Cir.1982).

■ The command that we generally respect the inferences and conclusions drawn by experienced police officers does not require that we abandon our responsibility to make the ulti-

mate determination of whether the police have acted in a lawful manner or that we "rubber stamp" conduct simply because the officer believed he had a right to engage in it. We understand that conduct that would seem innocent to an average layperson may properly be regarded as suspicious by a trained or experienced officer, but if the officer seeks to justify a Fourth Amendment intrusion based on that conduct, the officer ordinarily must offer some explanation of why he or she regarded the conduct as suspicious; otherwise, there is no ability to review the officer's action. *See United States v. Gooding,* 695 F.2d 78, 82 (4th Cir.1982) (although the court should consider the officer's subjective perceptions that may escape an untrained observer, "any such special meaning must be articulated to the courts and its reasonableness as a basis for seizure assessed independently of the police officers' subjective assertions, if the courts rather than the police are to be the ultimate enforcers of the principle.") (citing *Brown v. Texas,* 443 U.S. 47, 52, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357, 362 (1979)).

We are fully cognizant of dangers constantly lurking on our streets and of the plight of conscientious police officers who have to make split-second decisions in balancing their duties, on the one hand, to detect and prevent crime and assure their own safety while, on the other, respecting the dignity and Constitutional rights of persons they confront. The conduct here, on the record before us, crossed the line. If the police can stop and frisk any man found on the street at night in a high-crime area merely because he has a bulge in his pocket, stops to look at an unmarked car containing three un-uniformed men, and then, when those men alight suddenly from the car and approach the citizen, acts nervously, there would, indeed, be little Fourth Amendment protection left for those men who live in or have occasion to visit high-crime areas. We hold that Officer Moro did not have a reasonable basis for frisking petitioner and that the evidence recovered by him as a result of the frisk and subsequent extended search was inadmissible.

JUDGMENT OF COURT OF SPECIAL APPEALS RE-
VERSED; CASE REMANDED TO THAT COURT WITH
INSTRUCTIONS TO REVERSE JUDGMENT OF CIR-
CUIT COURT FOR BALTIMORE CITY AND REMAND
THE CASE TO THAT COURT FOR NEW TRIAL; COSTS
IN THIS COURT AND IN COURT OF SPECIAL AP-
PEALS TO BE PAID BY MAYOR AND CITY COUNCIL
OF BALTIMORE.

RAKER, Judge, concurring:

Today the Court holds that Officer Moro did not have a
reasonable basis for frisking petitioner and that the evidence
recovered by him as a result of the frisk and subsequent
extended search was inadmissible. I agree. While I join in
the Court's opinion, I write separately for two reasons.

First, it is important to note that while the circumstances do
not support a *Terry* frisk, neither do the facts or circum-
stances support a *Terry* stop. *See Carmouche v. State,* 10
S.W.3d 323, 329 (Tex.Crim.App.2000) (noting that by stating
that defendant's pat-down search was justified because he had
" 'reasonable suspicion to believe that [defendant] was in-
volved in criminal activity,' " the intermediate appellate court
improperly conflated the legal standard justifying the initial
stop with the legal authority to conduct the frisk. *"Terry* and
its progeny have carefully distinguished the two and empha-
sized the different justifications for each.").

Second, I disagree with the majority's *dicta* that "if the
officer seeks to justify a Fourth Amendment intrusion based
on that conduct, the officer ordinarily must offer some expla-
nation of why he or she regarded the conduct as suspicious;
otherwise, there is no ability to review the officer's action."
Maj. op. at. 111, 816 A.2d at 908. The reasonable, articulable
suspicion standard is an objective standard, not a subjective
one, and does not hinge upon the subjective belief of an
officer. There may be a reasonable, articulable basis for a
stop or frisk even though that basis was not articulated at the
suppression hearing.

## I. The *Terry* Stop

In the instant case, the State's sole basis for the encounter between petitioner and the police is that "[w]hen the officer saw the suspicious activity that led him to believe Ransome might have a handgun, the officer was entitled under *Terry* to stop him to investigate his suspicions and to frisk him to secure the officer's safety." [1] Sufficient and articulable facts to justify the limited intrusion of a *Terry* investigative stop are lacking. In order to have a valid *Terry* frisk, there must first be a valid *Terry* stop. Once a valid *Terry* stop has been made, police may conduct a frisk of the suspect if they have a reasonable, particularized, articulable suspicion that the suspect is armed. *See Terry v. Ohio*, 392 U.S. 1, 21, 27, 88 S.Ct. 1868, 1880, 1883, 20 L.Ed.2d 889 (1968).

To justify a *Terry* stop, an officer must have reasonable, articulable grounds to believe that a particular person is committing, is about to commit, or has committed a crime. A *Terry* stop is a commonly used investigative tool of law enforcement, often necessary to permit an officer to investigate criminal activity effectively and safely. The reasonable suspicion required for a *Terry* stop is more than a hunch, requiring at least "some minimal level of objective justification" based on the totality of the circumstances. *United States v. Sokolow*, 490 U.S. 1, 7–8, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989).

In my view, sufficient grounds for a *Terry* stop are lacking in this case. The United States Supreme Court has stated

---

1. Of course, the police may engage in consensual conversations with persons even if there is no basis to stop the person. *See Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991) ("[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions."). At the suppression hearing in the instant case, the State argued that the initial encounter between the officers and petitioner was consensual, evolving into a *Terry* stop based upon the nervousness and demeanor of petitioner. Although the police may use information gathered during a consensual encounter to justify a *Terry* stop if they gather sufficient information to develop reasonable suspicion, the State does not make that argument before this Court to justify the stop or frisk.

repeatedly that it is not possible to articulate precisely the meaning of "reasonable suspicion" or "probable cause." *See Ornelas v. United States,* 517 U.S. 690, 695, 116 S.Ct. 1657, 1661, 134 L.Ed.2d 911 (1996). The concepts are "common-sense, nontechnical conceptions that deal with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Id.,* 517 U.S. at 695, 116 S.Ct. at 1661, 134 L.Ed.2d 911 (quoting *Illinois v. Gates,* 462 U.S. 213, 231, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983)). If Ransome's actions were sufficient to warrant a *Terry* stop, then anyone standing on a corner, talking with a friend in the late evening, in a high-crime area, with an unidentified "bulge" in a pocket, may be stopped. There is nothing in the record to indicate that Ransome was about to commit a crime or that he was committing a crime. The frisk or pat-down of Ransome cannot be justified as a protective *Terry* frisk flowing from a valid *Terry* stop. Moreover, a *Terry* frisk may not be used to see if a person is hiding something that may be evidence of illegal activity. In essence, a *Terry* frisk is a limited pat-down for the protection and safety of the officer during an investigative detention. *See Ybarra v. Illinois,* 444 U.S. 85, 93–94, 100 S.Ct. 338, 343, 62 L.Ed.2d 238 (1979). "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972).

## II.  Reasonable, Articulable Suspicion

In order to justify a stop or a frisk under the strictures of *Terry,* the police officer must "be able to point to specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant that intrusion." 392 U.S. at 21, 88 S.Ct. at 1880, 20 L.Ed.2d 889. The standard to determine the reasonableness of a particular search or seizure is an objective one. The question is whether "the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that

the action taken was appropriate." *Id.* at 21–22, 88 S.Ct. at 1880, 20 L.Ed.2d 889. An investigatory *Terry* stop is permissible if the officer has specific and articulable cause to believe that criminal activity is afoot; a *Terry* frisk is permissible if the officer has specific and articulable cause to believe that the individual stopped is armed and therefore poses a danger to himself or others.

"Articulable" does not mean articulated. *See Dennis v. State,* 345 Md. 649, 660–62, 693 A.2d 1150, 1155–56 (1997) (Raker, J., dissenting). Reasonable suspicion is measured by an objective test, not a subjective one. *See Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996).[2] Therefore, the validity of the stop or the frisk is not determined by the subjective or articulated reasons of the officer; rather, the validity of the stop or frisk is determined by whether the record discloses articulable objective facts to support the stop or frisk. *See, e.g., United States v. McKie,* 951 F.2d 399, 402 (D.C.Cir.1991) (noting that the standard under *Terry* is one of objective reasonableness, and thus "we are not limited to what the stopping officer says or to evidence of his subjective rationale; rather, we look to the record as a whole to determine what facts were known to the officer and then consider whether a reasonable officer in those circum-

---

**2.** In *Whren v. United States,* the Supreme Court noted that "the fact that the officer does not have the state of mind which is hypothecated by the reasons ... [providing] the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." 517 U.S. 806, 813, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996) (citations omitted). Although *Whren* dealt with probable cause, the reasoning has been applied equally to reasonable suspicion analysis. *See State v. Heminover,* 619 N.W.2d 353, 360 (Iowa 2000) (noting that even though *Whren* deals with probable cause to stop in a traffic violation, "*Whren* settles the question because we think there should be no distinction between a stop based on probable cause and a stop based on reasonable suspicion, *i.e.,* a *Terry* stop"); *see also Dennis v. State,* 345 Md. 649, 660, 693 A.2d 1150, 1155 (1997) (Raker, J., dissenting) (noting, in regard to reasonable suspicion justifying a *Terry* stop, that "*Whren* stands for the proposition that in determining the legitimacy of police conduct under the Fourth Amendment, a court must look to objective circumstances, and not the subjective motivations of the police officer").

stances would have been suspicious"); *United States v. Hawkins,* 811 F.2d 210, 212–15, 215 n. 5 (3d Cir.) (holding that *Terry* stop may be justified when circumstances presented a reasonable objective basis for a stop even though the officer's stated reasons for the stop were pretextual), *cert denied,* 484 U.S. 833, 108 S.Ct. 110, 98 L.Ed.2d 69 (1987); *State v. Heminover,* 619 N.W.2d 353, 356–62 (Iowa 2000) (holding that the State is not limited to reasons stated by investigating officer as grounds to justify a stop because reasonable suspicion is an objective standard, and an officer's subjective reasons for making a *Terry* stop are not controlling); *City of Fargo v. Sivertson,* 571 N.W.2d 137, 139, 141 (N.D.1997) (noting that subjective intent of arresting officer is not a factor in establishing reasonable suspicion for a *Terry* stop); *State v. Hawley,* 540 N.W.2d 390, 392–93 (N.D.1995) (holding that arresting officer had reasonable suspicion justifying a *Terry* stop despite the fact that he did not form any suspicion of criminal activity because reasonable suspicion is an objective, not subjective, standard); 4 Wayne R. LaFave, *Search and Seizure* § 9.4(a), at 138–40 (3d ed. 1996 & Supp.2003) (stating that the reasonable suspicion test under *Terry* is *"purely* objective and thus there is no requirement that an actual suspicion by the officer be shown;" "the objective grounds as to one offense are not defeated because the officer either thought or stated he was acting with regard to some other offense"). In this regard, I agree with the dissent of Judge Battaglia and Judge Cathell. *See* Diss. op. at 123, 816 A.2d at 915.

The appropriate test is not what the investigating officer articulates, but whether, looking at the record as a whole, a reasonable officer in those circumstances would have reasonably believed petitioner was engaged in criminal activity or about to do so. This is not to say that an officer's expertise gained from special training and experience can never be helpful. When an investigating officer has specialized training and testifies to inferences and deductions that may appear innocent to the untrained observer, the court may take that testimony into consideration in determining whether reasonable suspicion exists. The court is not bound by such testimo-

ny, nor is such testimony required. The officer's perceptions, deductions or inferences do not necessarily amount to objective facts.

The majority's view that "if the officer seeks to justify a Fourth Amendment intrusion based on that conduct, the officer ordinarily must offer some explanation of why he or she regarded the conduct as suspicious; otherwise, there is no ability to review the officer's action" is based on *United States v. Gooding,* 695 F.2d 78 (4th Cir.1982), a case that pre-dated *Whren.* This notion does not reflect the view of the majority of courts, and I have serious doubts that it is still viable in light of *Whren.*

I join in the judgment of the Court because I believe that, on this record as a whole, the officer did not have reasonable, articulable suspicion to stop or frisk petitioner.

BATTAGLIA, Judge, dissenting.

I respectfully dissent.

The majority holds that, "Officer Moro did not have a reasonable basis for frisking petitioner and that the evidence recovered by him as a result of the frisk and subsequent extended search was inadmissible." To reach that result, the majority parses away at and ignores all of the circumstances surrounding the stop and frisk. Having eliminated the context within which the stop and frisk occurred, the majority then determines that Officer Moro's observation of the bulge in Ransome's pocket, without more, was insufficient to provide the officer with reasonable suspicion to justify a frisk. In my opinion, this "divide and conquer" analysis is inappropriate.

Further, I believe that in the course of segmenting and discounting each of the factors surrounding the stop and frisk, the majority ignores the Supreme Court's mandate that we pay due regard to the trial court's factual findings and inferences, as well as the tenets of our well-established standard for reviewing the denial of a motion to suppress. That standard requires us to consider the evidence and all reasonable inferences that may be drawn therefrom in a light most

favorable to the prevailing party on the motion, which, in this case, was the State. For these reasons, and the reasons discussed herein, I am compelled to respectfully dissent.

The Fourth Amendment protects against unreasonable searches and seizures. *Nathan v. State,* 370 Md. 648, 659, 805 A.2d 1086,1093 (2002)(citing *United States v. Arvizu,* 534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002); *United States v. Mendenhall,* 446 U.S. 544, 551, 100 S.Ct. 1870, 1875, 64 L.Ed.2d 497 (1980); *Ferris v. State,* 355 Md. 356, 369, 735 A.2d 491, 497 (1999)). "The touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular government invasion of a citizen's personal security.'" *Wilkes v. State,* 364 Md. 554, 571, 774 A.2d 420, 430 (2001)(quoting, *Pennsylvania v. Mimms,* 434 U.S. 106, 108–09, 98 S.Ct. 330, 332, 54 L.Ed.2d 331 (1977))(quoting *Terry v. Ohio,* 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968)). Reasonableness depends " 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'" *Id.* (quoting *Mimms,* 434 U.S. at 108–09, 98 S.Ct. at 332, 54 L.Ed.2d at 336)(quoting *United States v. Brignoni–Ponce,* 422 U.S. 873,. 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975)). With respect to a frisk for weapons, an "officer need not be absolutely certain that the individual is armed." *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909. "[I]n determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Id.* A frisk for weapons is justified when "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* Since *Terry v. Ohio,* the Supreme Court has "said repeatedly" that courts "must look at the 'totality of the circumstances' of each case" in making "reasonable-suspicion determinations." *Arvizu,* 534 U.S. at 273, 122 S.Ct. at 750, 151 L.Ed.2d at 749 (2002)(citing *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66

L.Ed.2d 621 (1981)(stating that "the essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account") (citations omitted)); *see also Nathan,* 370 Md. at 660, 805 A.2d at 1093 (stating that "[t]he determination of whether reasonable suspicion existed is made by looking at the totality of the circumstances in each case to see whether the officer had a particularized and objective basis for suspecting illegal activity").

Because the totality of the circumstances is so crucial to a proper analysis of reasonable suspicion, and is what the majority seemingly fails to consider, I shall briefly discuss the suppression hearing evidence regarding the circumstances surrounding the stop and frisk in the instant case.

Officer Moro was the only witness who testified at that hearing. He identified himself as a member of the Baltimore City Police Department's "flex unit," a specialized force that targets areas of the city with high rates of violent crime, narcotic sales, and handgun use. At approximately 11:20 p.m. on Friday, July 28, 2000, he and two other officers, all in plain clothes, were patrolling the 100 block of North Decker Street in an unmarked car. They were patrolling that area because of numerous citizen complaints regarding the discharging of guns, narcotics activity, and loitering.

Officer Moro's patrol car turned from Fayette Street onto North Decker Street and headed south on that street. The night was dark, North Decker was dimly lit, and devoid of pedestrian traffic except for Ransome, who was about "10 to 12" feet from Officer Moro when the officer first noticed him, and one other individual next to whom Ransome was standing. As the patrol car approached and started slowing down, Ransome turned to his right to face the vehicle and gazed at Officer Moro for approximately 15 seconds. At that point, Officer Moro, seated in the rear passenger side of the vehicle, noticed a large bulge in Ransome's left front pants pocket. He testified that what drew his attention to the bulge was "[t]he fact it was so visible in the pants." He exclaimed to his fellow officers that he suspected it was a gun.

The officers then got out of the car and Officer Moro approached Ransome, and asked him, "hey man, you mind if I speak to you?" Ransome stared at Officer Moro, but gave no response. Officer Moro then asked Ransome his name and where he lived. Officer Moro testified that he did so in order to "feel out the situation." He explained that "[i]t's a tactical approach." Ransome answered both questions, and during the interaction, Officer Moro noted that Ransome avoided eye contact and that his voice indicated he was nervous.[1]

Officer Moro then told Ransome to place his hands on his head and proceeded to do a pat down search, starting at Ransome's waistline. He explained that he started at the waistline, rather than going directly to the bulge in the pocket, because "it's a systematic pat-down. I'm going off of what I was trained. I directly go to the waist area. [Ninety] percent of whatever is concealed, it's concealed in the waist area. Then I move into the left pocket and conducted my outer garment pat-down throughout the whole course of the body."

He felt a bulge in the waist area, which he suspected to be narcotics. Officer Moro continued his search for weapons, eventually coming to the bulge in the pants pocket, which felt hard. He then went back up to the bulge in the waist area, lifted Ransome's shirt, and saw a plastic bag with what appeared to be marijuana. He recovered the drugs, arrested Ransome, and upon conducting a full search incident to the arrest, also recovered cocaine. The large bulge in the left front pants pocket turned out to be over $ 900 dollars in cash comprised of 37 bills wadded up into a ball.

The trial court judge explicitly found Officer Moro's testimony to be credible and determined: "[W]e have a bulge, a nervousness in response, we have the environment, . . . we have the flex unit purposes, [and] the citizen complaints . . . of discharging of weapons and trafficking in drugs." The court then concluded that in light of all the circumstances, Officer

---

1. Although the officer did not include that information in a probable cause report or a statement of charges, he testified that he does not always put all details in those reports.

Moro had a "reasonable articulable suspicion" to stop and frisk Ransome. I agree.

The Supreme Court has declared that in analyzing whether there was reasonable suspicion, "a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911, 920 (1996). Similarly, this Court has declared that in reviewing the denial of a motion to suppress, we give "all favorable inferences to the State." *In re David S.,* 367 Md. 523, 529, 789 A.2d 607, 610 (2002); *see also Wilkes,* 364 Md. at 569, 774 A.2d at 429 (stating that "[w]e review the facts found by the trial court in the light most favorable to the prevailing party" which is the State when a motion to suppress is denied); *Stokes v. State,* 362 Md. 407, 414, 765 A.2d 612, 615 (2001); *Cartnail v. State,* 359 Md. 272, 282, 753 A.2d 519, 525 (2000); *In re Tariq A–R–Y,* 347 Md. 484, 488, 701 A.2d 691, 693 (1997).

Despite the trial judge's findings as to the circumstances contributing to Officer Moro's reasonable suspicion—the bulge, nervousness, environment, flex unit purpose, and citizen complaints of weapons being discharged and drug activity—the majority questions "the extent to which they, or indeed any of them, were truly a factor in the decision to stop and frisk petitioner." The majority refers to the following testimony from Officer Moro as the source of its speculation:

[Court]: You testified here to what you observed about his demeanor as being a relevant part of your thinking process as an officer, a professional. Why wouldn't that be incorporated ... in your [probable cause] report?

[Moro]: That's one part, your honor. The part I focused on in my report was that, based upon observing the bulge, that I became fearful at this point of the bulge and, based upon my training and experience, I know that weapons are concealed in the waistband, concealed in pockets and based upon just observing the bulge alone of being possi-

bly a hard object or weapon that that would give me enough reasonable suspicion as well as becoming [fearful] of my safety and my other officers, that I had enough to go do a stop and frisk on this gentleman.

The court continued to press the officer:

[Court]: Well, not to make a fine point of it ... [i]f you drove by him on north decker, you [wouldn't] be fearful [that] he would pull out a gun and start shooting at you?

* * *

You must drive past people with guns unfortunately.

[Moro]: Would I be fearful?

* * *

Yes.

[Court]: ... Fearful of what?

[Moro]: Of my safety. Fearful he might have a gun, would draw the gun and take my life. Based upon the bulge, I was going to conduct a stop and frisk. The reason I asked these questions were just to buy me time to feel him out, but I was—at that point, I was going to do a stop and frisk.

But that was not the only testimony from Officer Moro regarding his rationale for deciding to conduct a stop and frisk. The officer also testified:

[Moro]: I approached the defendant and asked if I could speak with him.

* * *

[Q:] What did he say at that point?

[Moro]: He was looking at me, made no comments, just made eye contact with me.

[Q]: What happened next?

[Moro]: At which point I approached him I asked him a couple of questions as what is your name? And he gave his name as Deshawn Ransome.

Now, while he's talking to me I'm noticing the defendant's eyes are not really, not making any more contact with me

and it appears his voice was getting real nervous at this point.

\* \* \*

[Q]: And what did you do at that point, officer?

[Moro]: At that point, based on what I'm seeing with the bulge in his pocket and the way the defendant's mannerism, the way he's talking to me, at that point I advised him to place his hands on top of his head and conducted an outer garment pat down based upon all my observations and defendant's mannerisms.

By focusing on the officer's testimony while being questioned by the court about his probable cause report, and ignoring portions of his testimony where he describes his rationale for stopping and frisking Ransome, the majority fails to "review the facts found by the trial court in the light most favorable to the prevailing party," *Wilkes,* 364 Md. at 569, 774 A.2d at 429, and fails to objectify that review in light of the totality of circumstances in which the officers found themselves.

The test is whether a reasonable officer, in light of all the circumstances known to him at the time, would have effectuated a stop and frisk. The Supreme Court of Wisconsin recently spoke of this in *State v. McGill,* 234 Wis.2d 560, 609 N.W.2d 795 (2000). There, the court observed that "the record establishes a number of very specific facts that support [a reasonable suspicion], although not all were relied upon by the officer as a part of his subjective analysis of the situation." *Id.* at 570, 609 N.W.2d at 801. "But ... this is an objective test," the court declared, "and therefore certain factors, such as the time of night and the fact that the officer was alone, can and should be part of the equation." *Id.* The Supreme Court of Wisconsin explained that *Terry v. Ohio, supra,* did not "restrict its reasonableness analysis to the factors the officer testifies to having subjectively weighed in his ultimate decision to conduct the frisk." *Id.* at 571, 609 N.W.2d at 801–02. To the contrary, the court recognized that *Terry* establishes an objective test: " 'would the facts available to the officer at the

moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?' " *Id.,* 609 N.W.2d at 802 (internal quotations omitted). Thus, the court concluded that it could "look to any fact in the record, as long as it was known to the officer at the time he conducted the frisk and is otherwise supported by his testimony at the suppression hearing." *Id. See also United States v. Roggeman,* 279 F.3d 573, 580 n. 5 (8th Cir.2002)(stating that the objective, reasonable suspicion test is not based on "what the searching officer actually believed but what a hypothetical officer in exactly the same circumstances reasonably could have believed"). Unfortunately, the majority in this case fails to adhere to these tenets.

Equally as unpersuasive is the majority's position that Officer Moro failed to adequately articulate why he found the circumstances surrounding the stop and frisk to be suspicious. Specifically, the majority complains that "Officer Moro never explained why he thought that petitioner's stopping to look at his unmarked car as it slowed down was suspicious or why petitioner's later nervousness or loss of eye contact, as two police officers accosted him on the street, was suspicious." Additionally, the majority explains that it "understand[s] that conduct that would seem innocent to an average layperson may properly be regarded as suspicious by a trained or experienced officer." But for an officer to justify a Fourth Amendment intrusion based on such conduct, the Court concludes, the officer must "offer some explanation of why he or she regarded the conduct as suspicious; otherwise, there is no ability to review the officer's action." *"Terry* requires," the majority continues, "the officer to point to 'specific and articulable facts' justifying his conduct.' "

*"Terry* does not require," however, "the law-enforcement officer performing the search to state the reasons justifying the search articulately, only that such reasons be articulable." *Roggeman,* 279 F.3d at 583–84. I disagree with the majority's conclusion that Officer Moro needed to and did fail to point to "specific and articulable facts" justifying the stop and frisk. Moreover, I also disagree with the very premise of the majori-

ty's statements, for it does not take a specially trained law enforcement officer to reasonably conclude that the factors here were suspicious. At almost midnight on a deserted and dimly lit street in an area of Baltimore City plagued with gun fire and narcotics activity, Officer Moro and his fellow officers, while traveling in their unmarked patrol car, came upon Ransome and his companion. Ransome did not just glance at Officer Moro, he gazed directly at Moro for fifteen seconds, physically turning his body to the right to face the officer's unmarked car head on. And at that moment, still locked in Ransome's gaze, Officer Moro noticed the large bulge in Ransome's left front pants pocket. He immediately suspected that it was a weapon. These factors would appear suspicious to an objective reasonable person, even without any specialized law enforcement training or experience.

That is, unless you change the scene to that of an airport, as the majority has done by relying on the case of *United States v. Gooding*, 695 F.2d 78 (4th Cir.1982). In that case, Gooding arrived at Washington National Airport on a flight from New York City at about 3:00 p.m. *Id.* at 79. Gooding caught the attention of officers who were patrolling the airport for drug couriers because most of the passengers on his flight were wearing business suits, while he was dressed in slacks, a sweater, and a coat. *Id.* The officers followed Gooding and noted that he carried a briefcase and flight bag, but picked up no checked baggage. He also appeared "nervous" and "suspicious" to one of the officers. *Id.* Another described him as appearing "angry" and " 'distraught' over someone's not being there." *Id.* Gooding made a telephone call, and "appeared to get no response." *Id.* After making a second call, he went into a bar for one minute, left, entered a restaurant and ate for 25 minutes, and then made a third telephone call. *Id.* Thereafter, he departed the airport and started walking towards public transportation. *Id.*

At that point, two of the officers who were following Gooding approached him, identified themselves as police, and eventually asked to search his briefcase and flight bag. *Id.* at 79–80. After Gooding consented, the officers recovered cocaine

and arrested him. *Id.* at 80. Gooding was later charged with possession and intent to distribute, and after Gooding's pretrial motion to exclude that evidence was denied, he was convicted on those charges. Gooding appealed to the United States Court of Appeals for the Fourth Circuit, which vacated the conviction and remanded because "his seizure was impermissible under the fourth amendment." *Id.* at 84–85.

The *Gooding* court explained that in making reasonable suspicion determinations, courts should "take into account that trained law enforcement officers may be 'able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer.' " *Id.* at 82 (quoting *United States v. Mendenhall,* 446 U.S. 544, 563, 100 S.Ct. 1870, 1882, 64 L.Ed.2d 497 (1980)(Powell, J., concurring)). The court cautioned, however, that "any such special meaning must be articulated to the courts and its reasonableness as a basis for seizure assessed independently of the police officers' subjective assertions, if the courts rather than the police are to be the ultimate enforcers of the principle." *Id.* (quoting *Brown v. Texas,* 443 U.S. 47, 52, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357, 362 (1979)). Applying these principles to "objective criteria articulated by the police for the detention of [a] citizen," the court concluded that the seizure was "impermissible under the fourth amendment." *Id.* at 84. Those "objective criteria" were as follows:

1) [defendant] arrived from New York, a source city for drugs; 2) he was dressed casually on a 3:00 p.m. businessmen's flight; 3) he made a telephone call immediately after arriving and subsequently made two other phone calls; 4) he scanned the concourse after deplaning; 5) he acknowledged the agent's presence in an alleged cat-and-mouse game of mutual surveillance, and 6) to two of the agents his demeanor appeared distraught and nervous.

*Id.* at 83. The court noted that although many of these criteria appear in " 'drug courier profiles,' " it had "specifically held that a drug courier profile, without more, does not create a reasonable and articulable suspicion." *Id.* at 83. Thus, it concluded that the seizure was unconstitutional.

If the facts in this case had taken place in an airport in the afternoon after a business flight, I would be more persuaded by the majority's position that Officer Moro had to articulate how, in light of his specialized training and experience, he had found certain factors to be suspicious. Indeed, an average layperson would not find it suspicious, in my opinion, to see Ransome and his companion walking through an airport together. And the bulge in Ransome's front pants pocket would not seem out of the ordinary or indicate anything suspicious, as most of us have experienced travel, if not on planes then on trains or buses, and understand that one carries more personal items when traveling than one would normally. Indeed, in hasty travel and wanting of baggage space, people often pack their pockets with bulky items.

But our facts did not take place in an airport. Quite to the contrary, Ransome was located on a poorly lit city street, close to midnight, in an area in which complaints about the discharging of weapons and narcotics trafficking had been received. Viewed within those circumstances, it does not take the expertise of a police officer to know that an unusually large bulge in the front pocket of pants, coupled with a fifteen second gaze and subsequent nervousness, is a suspicious set of circumstances.

In *Pennsylvania v. Mimms,* two police officers on routine patrol observed Mimms driving an automobile with expired tags and stopped him because of that. 434 U.S. at 107, 98 S.Ct. at 331, 54 L.Ed.2d at 334. One of the officers asked Mimms to step out of the car and produce his license and title. *Id.* When Mimms exited the car, the officer noticed "a large bulge under [Mimms's] sports jacket." *Id.* "Fearing that the bulge might be a weapon, the officer frisked [Mimms] and discovered in his waistband a .38–caliber revolver loaded with five rounds of ammunition." *Id.* Mimms was then arrested and indicted for carrying a concealed deadly weapon and for unlawfully carrying a firearm without a license. *Id.,* 434 U.S. at 107, 98 S.Ct. at 331, 54 L.Ed.2d at 335. Prior to trial, Mimms filed a motion to suppress, which was denied, and he was convicted for the above mentioned charges. *Id.*

The Supreme Court of Pennsylvania reversed on the basis that the officer's ordering Mimms to get out of his car was an impermissible seizure. *Id.* With respect to the bulge, however, it "was willing to assume, arguendo, that the limited search for weapons was proper once the officer observed the bulge under [Mimms's] coat." *Id.*, 434 U.S. at 107, 98 S.Ct. at 331–32, 54 L.Ed.2d at 335.

The Supreme Court not only assumed, but specifically ruled that the search was justified. The Court stated that "[u]nder the standard enunciated in [*Terry v. Ohio*] whether 'the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate'—there is little question the officer was justified." *Id.* at 112, 98 S.Ct. at 334, 54 L.Ed.2d at 337–38 (internal quotations omitted). The Court explained that "[t]he bulge in the jacket permitted the officer to conclude that Mimms was armed and thus posed a serious and present danger to the safety of the officer." *Id.* "In these circumstances," the Court concluded, "any man of 'reasonable caution' would likely have conducted the 'pat down.'" *Id.*, 434 U.S. at 112, 98 S.Ct. at 334, 54 L.Ed.2d at 338.

The majority's answer to *Mimms* is simply that each case must be judged upon its own facts, and that to apply *Mimms* "uncritically to any large bulge in any man's pocket, would allow the police to stop and frisk virtually every man they encounter." I do not suggest that the *Mimms* decision, or any other case, should be applied uncritically. What I do strongly suggest, however, is that the circumstances of the instant case are at least as compelling as those in *Mimms*. *Mimms* dealt with a traffic stop, which, by its nature, is particularly dangerous for officers. So also is a street encounter with a nervous citizen at night in an area specifically known for being infested with narcotics and having a problem with people discharging weapons. Thus, in my view, the combination of factors here was at least as compelling as those in *Mimms*.

Also, I am no more convinced by the majority's attempt to distinguish the many other cases cited by the State. "[T]o be sure," the majority concedes, "[t]here have been ... many cases in which a bulge in a man's clothing, along with other circumstances, has justified a frisk." But "[e]ach of those cases," according to the majority, "presents a combination of circumstances justifying a reasonable belief that the bulge noticed by the officer may be a weapon or that criminal activity may be afoot, a combination lacking here." Unlike the defendants in those cases, the majority continues, "petitioner had done nothing to attract police attention other than being on the street with a bulge in his pocket at the same time Officer Moro drove by."

I respectfully disagree with the majority's sanitization of the facts. Ransome did not just happen to be strolling down the street with a companion when Officer Moro drove by. Ransome was on a dimly lit street devoid of any pedestrian traffic except for himself and his companion, near midnight, in an area of the city known for narcotics dealing, gun fire, and loitering. Officer Moro did not just, as the majority characterizes it, "[drive] by." As a member of a specialized police unit that deals with violent crime, Officer Moro and his fellow officers were patrolling North Decker Street in response to numerous citizen complaints regarding drugs, weapons, and loitering. It is within this context (which the majority inappropriately avoids) that Officer Moro noted Ransome's gaze and identified the large bulge in Ransome's left front pants pocket.

The majority asserts that Ransome "had not committed any obvious offense"; he was not "behind a residence [2] or found on a day care center porch late at night." He "was not without identification, was not a known criminal or in company with one, was not reaching for the bulge in his pocket or engaging

---

**2.** I take issue with the majorities recitation of the facts on this point. Indeed, Officer Moro testified at the suppression hearing that when he stopped and searched Ransome, Ransome was in front of "[a] dwelling."

in any other threatening conduct, did not take evasive action or attempt to flee, and the officer was not alone to face him." That the circumstances here are not *exactly* the same as those in the cases relied upon by the State is inconsequential. Essentially, the majority is taking a cookie cutter approach to *Terry* stops. The combination of factors here is just as compelling, if not more persuasive, than those distinguished in the State's cases. For all of the reasons mentioned above, I respectfully dissent.

Judge CATHELL authorizes me to state that he joins in this dissent.